UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

*v*.

JOSHUA WANDER,

*Defendant*.

**No. 25 Cr. 473 (JPO)**

**DEFENDANT JOSHUA WANDER'S MOTION FOR A BILL OF PARTICULARS**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..................... 1

FACTUAL BACKGROUND ..................... 3

A. Mr. Wander Built a Billion-Dollar Business with Dozens of Portfolio Companies in Multiple Industries. ..................... 3

B. SuttonPark's Credit Facilities Were Secured by Thousands of Assets that Routinely Changed. ..................... 4

C. The Indictment Does Not Particularize Which Collateral Was Double-Pledged or Missing, or Which Statements Were False. ..................... 5

D. The Government Refused to Identify What Collateral Was Double-Pledged or Missing, or Which Statements Were False. ..................... 6

ARGUMENT ..................... 7

A. The Government Must Identify the Specific Collateral Alleged to be Double-Pledged or Missing, and When the Deficiency Arose. ..................... 8

B. The Government Must Specify Which Representations Were False and Were Made with the Intent to Obtain Money or Property. ..................... 10

C. The Government Must Identify All Co-Conspirators. ..................... 12

CONCLUSION ..................... 13

## TABLE OF AUTHORITIES


**Page(s)**

**Cases**

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016) ... 11

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000) ... 13

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ... 7, 8, 9, 10

*United States v. Chen*,
378 F.3d 151 (2d Cir. 2004) ... 7

*United States v. D'Amato*,
39 F.3d 1249 (2d Cir. 1994) ... 12

*United States v. Hawit*,
2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ... 10

*United States v. Johnson*,
2017 WL 11490478 (E.D.N.Y. Oct. 26, 2017) ... 13

*United States v. Martoma*,
2013 WL 2435082 (S.D.N.Y. June 5, 2013) ... 13

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000) ... 9, 11, 12, 13

*United States v. Pinto-Thomaz*,
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ... 13

*United States v. Rajaratnam*,
2010 WL 2788168 (S.D.N.Y. July 13, 2010) ... 7

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007) ... 7

*United States v. Rinsch*,
807 F. Supp. 3d 238 (S.D.N.Y. 2025) ... 11

*United States v. Rinsch*,
816 F. Supp. 3d 488 (S.D.N.Y. 2026) ... 2

*United States v. Siddiqi*,
2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ... 11

**Page(s)**

*United States v. Vaid*,
2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) .......... 8, 9, 10

*United States v. Wang*,
2024 WL 1251105 (S.D.N.Y. Mar. 22, 2024) .......... 9

## Other Authorities

Bill of Particulars, *United States v. Steinberg*, 1:12 Cr. 121 (S.D.N.Y. Sept. 18, 2013), Dkt. No. 299 ..... 13

## Rules

Fed. R. Crim. P. 7(f) .......... 7

## PRELIMINARY STATEMENT

At its height, 777 Partners was a multibillion-dollar enterprise with more than 60 portfolio companies, thousands of employees on five continents, and operations spanning the consumer and commercial finance, insurance, aviation, sports, media and entertainment, and litigation finance industries. Its structured settlements subsidiary, SuttonPark Capital, became one of the largest buyers of such settlements in the country. Before macroeconomic shocks that affected the company and the world, SuttonPark generated hundreds of millions of dollars in profits and entered into legitimate lending arrangements with numerous private lenders. The government does not allege that any of this was unlawful.

What the government does allege appears to be far narrower: that beginning in 2021 and over a period of approximately two years, Mr. Wander caused false representations to be made in connection with three lenders to SuttonPark—a single subsidiary of a single portfolio company, 600 Partners, in which Mr. Wander held no equity, no title, and no board seat. The Indictment charges that a subset of collateral pledged to those three lenders was double-pledged or nonexistent, and that some number of borrowing base compliance reports submitted to those lenders overstated the value of the collateral. But the Indictment does not identify which assets were double-pledged, which were allegedly fictitious, or which specific compliance reports contained false financial data. The government has alleged a fraud involving thousands of receivables without naming even one.

The government's own Indictment also acknowledges the macroeconomic context. The government concedes that by 2021, rising interest rates and increased competition had diminished the profitability of 777 Partners' structured settlements business, reducing its cash and borrowing capacity. These headwinds—which affected the broader market, not just 777 Partners—provide essential context for what followed. Much of what the Indictment alleges

shows a business under acute financial pressure due to exogenous factors, attempting to manage its existing lender relationships. Concealment of a contractual breach, without more, does not constitute wire fraud—the wire fraud statute requires that misrepresentations be made with intent to obtain money or property, not merely to retain what was already received. *United States v. Rinsch*, 816 F. Supp. 3d 488, 491 (S.D.N.Y. 2026). Yet the Indictment makes no distinction between representations allegedly made to obtain new funds and those allegedly made to conceal existing deficiencies, leaving Mr. Wander unable to determine which conduct the government actually contends was criminal.

The government's failure to draw those distinctions is compounded by its refusal to identify the specific assets it contends were fraudulent. At the height of the SuttonPark lending program, a single credit facility could contain thousands of receivables in its borrowing base at any given time, with thousands more cycling through over the life of the facility. The underlying asset-level data for those facilities was maintained in a proprietary system—MPFin—that Mr. Wander did not personally operate or oversee and which the government has not produced in discovery. The government has made available more than one million documents from over 50 sources but has declined to identify which assets it believes were fraudulent, on the grounds that doing so would constitute "trial proof." Mr. Wander is now left to defend against allegations of fraud spanning years of complex transactions, involving tens of thousands of assets, without being told which ones the government believes were tainted by the alleged fraud.

The Indictment also fails to provide details about Mr. Wander's co-conspirators. Mr. Wander was the most senior executive at his companies. The Indictment is clear that any alleged false statements were made by his employees or others acting at his direction. His

companies employed thousands of people, and absent specificity, he is left to guess at the identity of those who supposedly committed crimes at his direction.

Basic fairness requires more. A defendant is entitled to know what he is accused of doing so that he can prepare a defense. Mr. Wander respectfully requests that the Court order the government to provide a bill of particulars identifying the specific assets alleged to have been double-pledged or nonexistent, the specific representations alleged to have been false, and the identities of the individuals whose conduct the government intends to impute to Mr. Wander.

## FACTUAL BACKGROUND

### A. Mr. Wander Built a Billion-Dollar Business with Dozens of Portfolio Companies in Multiple Industries.

Mr. Wander co-founded 777 Partners in 2015 as a private investment firm focused on alternative asset classes. Over the following years, 777 Partners and its related company, 600 Partners LLC (together, the "777 Companies") grew into a multibillion-dollar enterprise with more than 60 portfolio companies spanning numerous industries, including consumer and commercial finance, insurance, aviation, sports, media and entertainment, and litigation finance. The 777 Companies were highly profitable, reporting total consolidated revenue of $489 million in 2019.

Mr. Wander was the co-managing partner of 777 Partners. But his relationship with 600 Partners was markedly narrower. Contractually, Mr. Wander held no equity, official title, managerial role, or board seat in 600 Partners. This distinction is critical because the Indictment focuses on portfolio company SuttonPark, a subsidiary of 600 Partners.

SuttonPark invested in annuities, such as structured settlements and lottery winnings. Structured settlements are assets where lawsuit beneficiaries receive periodic payments over time rather than lump-sum payments. Likewise, the lottery winnings are assets involving periodic

payments over time. SuttonPark made profits by purchasing, aggregating, and securitizing structured settlements and lottery winnings. *See* Indictment ¶ 6. SuttonPark grew to be "one of the largest buyers of structured settlements in the secondary market." *See id.* ¶ 2.

### B. SuttonPark's Credit Facilities Were Secured by Thousands of Assets that Routinely Changed.

SuttonPark, through subsidiary special purpose vehicles ("SPVs"), used debt financing to purchase structured settlements and lottery winnings. It maintained numerous revolving credit facilities with multiple private lenders and would often have several credit facilities with just one lender. *See* Indictment ¶¶ 3–5. Each facility was governed by its own master loan and security agreement, which together with the related exhibits, schedules, and amendments, spanned hundreds of pages. *See id.* ¶¶ 3–4. The facilities were secured by collateral consisting of the structured settlement and lottery winning receivables.

The amount an SPV could borrow on a credit facility depended on a complex, multi-variable borrowing base formula, and the formula varied from borrower to borrower.[1] But under each formula, the borrower was required to aggregate the valuation amount for the receivables securing the loan.

Each credit facility operated as a dynamic, revolving arrangement in which the pool of pledged collateral was in near-constant flux. At any given reporting date, a single facility's borrowing base could contain thousands of individual receivables, each identified by a unique asset identifier, payment schedule, expected payment stream, and obligor. The composition of

[1] For example, the borrowing base formula for one SPV required: (1) computing the aggregate valuation amount for certain receivables multiplied by a loan-to-value percentage specific to each asset group; (2) computing the aggregate valuation amount for other receivables and multiplying by 95%; (3) adding cash on deposit in the reserve account; (4) adding the market value of hedge transactions; and (5) then subtracting excess concentration amounts and any unpaid hedge breakage costs.

that borrowing base changed continuously as SuttonPark purchased new receivables, as existing receivables were paid down or matured, and as assets were added, removed, or substituted in the ordinary course of managing each facility's borrowing capacity. These adjustments were routine and frequent—often occurring on a weekly or even daily basis—and were reported to lenders through monthly compliance reports that reflected the then-current state of the borrowing base. *Id.*

And because of this turnover, the universe of assets that cycled through a single facility over its life was vastly larger than the borrowing base at any point in time. Over the life of a single facility, thousands of distinct receivables passed through the borrowing base. Multiplied across multiple facilities and multiple lenders—each governed by its own loan agreement—the total population of assets potentially at issue in this case numbers in the tens of thousands.

### C. The Indictment Does Not Particularize Which Collateral Was Double-Pledged or Missing, or Which Statements Were False.

The Indictment, unsealed on October 16, 2025, makes broad and generalized allegations that Mr. Wander defrauded lenders. The Indictment alleges four counts, including wire fraud and securities fraud, premised on a sweeping theory that Mr. Wander defrauded lenders and investors over a multi-year period. The Indictment generally alleges that the fraud involved: (1) using restricted funds from the credit facilities to fund other aspects of Mr. Wander's business; and (2) making false representations about the borrowing base on various facilities. Indictment ¶¶ 8–14. The Indictment is conspicuously silent, however, as to any specific "draw," meaning receipt of funds, on the credit facilities tied to a "false and misleading borrowing base compliance report" authorized or directed by Mr. Wander. *See id.* ¶¶ 12–14. Nor does the Indictment identify with specificity what assets on a borrowing base report were fraudulent. That generality has left Mr. Wander to guess which of the thousands of transactions and

communications between the 777 Companies and their lenders the government will attempt to prove were fraudulent.

### D. The Government Refused to Identify What Collateral Was Double-Pledged or Missing, or Which Statements Were False.

The government's voluminous discovery has only compounded, rather than cured, the vague Indictment. The government produced more than one million documents over the course of four productions starting from November 5, 2025, and continuing until March 16, 2026. As the production letters indicate, these materials came from more than *50* third parties and included compliance reports with thousands of assets, thousands of pages of wire transactions, and numerous highly detailed contracts of unclear relevance. *See* Estes Decl., Exs. A (November 5, 2025 Production Ltr.), B (November 24, 2025 Production Ltr.), C (January 12, 2026 Production Ltr.), D (March 16, 2026 Production Ltr.). Further worsening the problem, the asset-level data underlying the compliance reports was maintained in a system called MPFin—a platform that Mr. Wander did not personally use and which was operated by others within SuttonPark. MPFin served as the system of record for the receivables in the borrowing base, and the compliance reports delivered to lenders were generated from its data. The government has not produced a complete record of the MPFin data underlying each borrowing base report. Without that data, the defense has no means of independently auditing the compliance reports or evaluating the government's contention that any specific representation was false.

On April 15, 2026, pursuant to Federal Rule of Criminal Procedure 7(f) and Local Rule 16.1, Mr. Wander sent government counsel a letter requesting particulars. *See* Estes Decl., Ex. E (April 15, 2026 Ltr.). Mr. Wander noted that "[t]he prosecution has not identified which documents contain false statements, which assets were allegedly double-pledged or non-existent, and which wire transfers were in violation of credit agreements with lenders." *Id.* at 1. Mr.

Wander asked for particulars on 24 topics, to ensure he "can fully understand the charges against him to prepare his trial defense." *Id.*

On April 22, 2026, the government largely dismissed Mr. Wander's request for particulars. *See* Estes Decl., Ex. F (April 22, 2026 Ltr.). Although the government pointed to a handful of documents within its million-document production, it declined to answer any of the core questions Mr. Wander asked—namely, what was said, when, by and to whom, and which of the thousands of transactions were allegedly fraudulent—on the grounds that this would constitute "trial proof." *See id.* at 1, 2–3 (responses to Requests 6, 7, and 10). The government also claimed that the Indictment identifies the relevant time period, conduct, and nature of the scheme. *See id.* at 1. However, the relevant time period spans multiple years, and the nature of the scheme alleged is broad and encompasses thousands of transactions. The information in the Indictment is simply not sufficient for Mr. Wander to prepare his defense.

## ARGUMENT

An Indictment must be specific enough to permit a defendant to prepare a defense. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987). Rule 7(f) allows a defendant to seek a bill of particulars when the charges are "so general that they do not advise the defendant of the specific acts of which he is accused." Fed. R. Crim. P. 7(f); *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004). The purpose of a bill of particulars is to "enable[] a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Rajaratnam*, 2010 WL 2788168, at *1 (S.D.N.Y. July 13, 2010) (quoting *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007)). "In cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions it intends to prove are fraudulent if this

information is not ascertainable; otherwise, in effect, 'the burden of proof impermissibly [may] shift[ ]' to the defendant to prove the documents or transactions are not fraudulent." *United States v. Vaid*, 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (quoting *Bortnovsky*, 820 F.2d at 575).

### A. The Government Must Identify the Specific Collateral Alleged to be Double-Pledged or Missing, and When the Deficiency Arose.

The core of the Indictment's lender fraud theory is that Mr. Wander, or someone acting at his direction, double-pledged collateral securing the credit facilities or pledged collateral that SuttonPark did not own. Indictment ¶¶ 1, 9, 11, 13–14. But the Indictment does not identify a single specific receivable alleged to be double-pledged or non-existent. It refers only to generic categories: assets "777 Partners claimed to own, but did not in fact have title to," *id.* ¶ 9; structured settlements "never purchased," *id.* ¶¶ 11, 13; "more than 250 assets" double-pledged in connection with a single borrowing request to Lender-3, *id.* ¶ 14; and "thousands of receivables" allocated to both Lender-1 and Lender-2 at some unspecified time, *id.* ¶ 19. Not one is identified by asset number, payment stream, originator, or any other attribute that would allow the defense to locate it. Nor does the Indictment specify when any given asset was allegedly double-pledged or missing—a critical omission because the status of an asset could change over time.

That omission is not cured by discovery. The government's production exceeds one million documents from more than fifty sources, including monthly compliance reports listing thousands of receivables, tens of thousands of rows of transaction data, and wire transfer records encompassing thousands of transactions across the facilities. The government has confirmed it will not identify the specific assets because doing so would constitute "trial proof." April 22, 2026 Ltr. at 1, 2–3. But the government cannot satisfy its notice obligation "by providing

mountains of documents to defense counsel who are left unguided" as to the relevant documents. *Bortnovsky*, 820 F.2d at 575. Courts regularly require the government to identify specific assets or transactions alleged to be fraudulent when voluminous records make the alternative an unfair audit of everything. *See United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (granting particulars where government failed to specify which of thousands of Medicare claims "were false and in what way they were false"); *Vaid*, 2017 WL 3891695, at *11 (requiring specification of fraudulent documents or transactions to avoid impermissible burden-shifting); *United States v. Wang*, 2024 WL 1251105, at *4 (S.D.N.Y. Mar. 22, 2024) (collecting cases requiring particulars as to specific wire transfers in fraud cases).

The prejudice is particularly acute here because of the complexity of the underlying collateral arrangements. A single SuttonPark facility could contain thousands of receivables in its borrowing base at any given reporting date, each tracked by a unique identifier, payment schedule, and obligor. Over a facility's life, thousands of distinct receivables cycled through that base. Whether any given receivable counted toward the borrowing base on a particular date—and at what value—depended on a multi-variable formula that varied by lender and asset class. That calculation was driven by data maintained in MPFin, SuttonPark's system of record for borrowing base collateral, which Mr. Wander did not personally operate. The government produced only a limited set of raw data from MPFin, which fails to encompass the full range of the alleged fraud, how assets were transferred across facilities, when, and by whom. Without identifying which assets it contends were tainted, the government leaves Mr. Wander to audit every single receivable across three facilities over a multi-year period and reconstruct the full borrowing base calculation for each—without the one system that generated those calculations in

the first place. That is precisely the burden-shifting that *Bortnovsky* and its progeny forbid. *See Bortnovsky*, 820 F.2d at 575; *Vaid*, 2017 WL 3891695, at *11.

The government's own Indictment underscores the problem. The Indictment alleges a Lender-1 borrowing base deficiency of "approximately $200 million" by 2022. Indictment ¶ 15. Yet a September 25, 2021, email from CFO Alfalla to Mr. Wander—cited in the Indictment itself—notes a deficiency exceeding "$300m+" more than a year earlier. *Id.* ¶ 25. The government's narrative thus suggests the alleged deficiency shrank between September 2021 and 2022—a trajectory that is inconsistent with the theory of an escalating, deliberately concealed shortfall. Without particulars on which assets are supposedly fraudulent, the defense cannot evaluate which figure is accurate, how either was calculated, or what assets account for the difference. Mr. Wander will be in the same position as the defendants in *Bortnovsky* and *Nachamie*: "accused of having committed unlawful acts in connection with a category of transactions, but without being given notice of which specific transactions falling within that category are alleged to have been tainted by unlawful conduct." *United States v. Hawit*, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017). The Court should therefore order the government to particularize the alleged wire fraud scheme.

### B. The Government Must Specify Which Representations Were False and Were Made with the Intent to Obtain Money or Property.

The Indictment describes numerous categories of representations made to lenders over a multi-year period: monthly borrowing base compliance reports; drawdown certifications; screenshots of collection account balances; and statements in recorded phone calls. *See* Indictment ¶¶ 5, 9, 12–22. It does not specify which of those representations the government will contend at trial were materially false, who made each one, or when. Courts in this district regularly require that specificity. *See United States v. Siddiqi*, 2007 WL 549420, at *3 (S.D.N.Y.

Feb. 21, 2007) ("[W]here defendants have prepared multiple statements or documents, the Government should specify which of these are being called into question, lest defendants be forced to review all of the statements or documents in order to prepare a defense of the veracity of each"); *United States v. Rinsch*, 807 F. Supp. 3d 238, 253 (S.D.N.Y. 2025) (ordering government to provide "a written specification of each of the materially false statements" the government would contend were made by the defendant); *Nachamie*, 91 F. Supp. 2d at 574 (requiring identification of each false claim the government intends to prove at trial, including when and where it was prepared and submitted).

That need here is sharpened by a structural ambiguity running through the Indictment. Wire fraud requires that a misrepresentation be made with intent to obtain money or property—a misrepresentation concerning money or property already obtained is not wire fraud. *See Rinsch*, 816 F. Supp. 3d at 491 ("the lawful receipt of money followed by later misrepresentations aimed solely at retaining it" is not wire fraud); *see also U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016) (requiring "contemporaneous fraudulent intent" at the time of the representation). The Indictment blurs this line throughout. Its opening allegations concern obtaining new funds through false borrowing base certifications submitted in support of new draws. Indictment ¶¶ 9–11. But much of the Indictment alleges concealment of a deficiency already in existence through subsequent alleged misrepresentations. *Id.* ¶¶ 16–17 (representations about funds in collection accounts), 20–21 (representations about the cause of the deficiency), 18 (representations about the status of the credit facility). The Indictment does not distinguish which representations were made to obtain money and which were made solely to conceal. The Indictment likewise does not distinguish between acts that constitute wire fraud and acts that are mere breaches of contract, such as the alleged misuse of lawfully acquired

funds. *Id.* ¶¶ 8–11; *see also United States v. D'Amato*, 39 F.3d 1249, 1261 n. 8 (2d Cir. 1994) ("A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract.").

Without these distinctions, Mr. Wander cannot determine the perimeter of the scheme he is charged with or prepare a targeted defense to each alleged act. The government must specify, for each false statement it intends to prove at trial, whether it was made in connection with obtaining new funds—and if not, how it satisfies the wire fraud statute's intent requirement.

### C. The Government Must Identify All Co-Conspirators.

Mr. Wander is also entitled to know the identities of all alleged co-conspirators to understand whose statements and conduct are being imputed to him in the alleged wire fraud scheme. The government has refused to provide this information, even though the Indictment, in describing nearly every material act, refers vaguely to "others acting at [Mr. Wander's] direction." Indictment ¶¶ 1, 10, 11, 14, 17. The government disregards that, as the CEO of 777 Partners, Mr. Wander oversaw hundreds of employees whose day-to-day work was ostensibly performed at "Mr. Wander's direction." Without information about the identities of these alleged co-conspirators, Mr. Wander will be hindered in showing that any of their statements or actions in furtherance of the alleged wire fraud scheme were made independently and without his knowledge. To prepare for trial and avoid unfair surprise, therefore, the government must particularize the identities of the alleged co-conspirators in the Indictment.

The scope of the alleged conspiracy, the volume of discovery, and the absence of any countervailing risk all weigh heavily in favor of disclosure. The alleged conspiracy spans more than three years and involves over $500 million in assets, a scale that courts have recognized supports a bill of particulars. *See Nachamie*, 91 F. Supp. 2d at 573 ("[T]he alleged conspiracy has operated for a significant period of time (more than three years)."). The government's

production—exceeding one million documents, including approximately 78,000 Excel files containing thousands of rows of data—further underscores the need for particulars. *Id.* at 572 (considering the volume of pretrial disclosure in assessing a request for the identities of unindicted co-conspirators). Moreover, Mr. Wander, who is charged with white-collar offenses, poses no danger to any alleged co-conspirators, and disclosure would not jeopardize any ongoing investigation.[2] *Id.* Accordingly, the Court should order the disclosure of the identities of the alleged co-conspirators.

**CONCLUSION**

For the foregoing reasons, this Court should grant Mr. Wander's request for a bill of particulars.

[2] *See e.g.*, *United States v. Johnson*, 2017 WL 11490478, at *1 (E.D.N.Y. Oct. 26, 2017) ("[T]he court ordered the Government to identify any unindicted co-conspirators."); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 241 (S.D.N.Y. 2000) ("We conclude that the Government must disclose to the Defendants the identities, including all aliases and code names, of all unindicted co-conspirators to whom it will refer at trial."); Bill of Particulars, *United States v. Steinberg*, 1:12 Cr. 121 (S.D.N.Y. Sept. 18, 2013), Dkt. No. 299 (providing bill of particulars identifying co-conspirators pursuant to court order); *United States v. Martoma*, 2013 WL 2435082, at *7 (S.D.N.Y. June 5, 2013) (court order required the government to identify all known co-conspirators); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018) (requiring identification of unindicted co-conspirators where defendant was alleged to have conspired with only one named individual and additional conspirators would meaningfully alter trial preparation).

Dated: May 15, 2026

Respectfully submitted

*/s/ Jordan Estes*
Jordan Estes
Dani R. James
Michael Martinez
Samuel Raymond
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
JEstes@gibsondunn.com
DJames@gibsondunn.com
MMartinez2@gibsondunn.com
SRaymond@gibsondunn.com

*Attorneys for Joshua Wander*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York because it is 4,231 words (exclusive of the table of contents and authorities); and

2. This document complies with the typeface requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 12-point Times New Roman font, with footnotes that are at least 10-point font.

*/s/ Jordan Estes*
Jordan Estes
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY
10166
(212) 351-2315
JEstes@gibsondunn.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

***v.***

**JOSHUA WANDER,**

***Defendant.***

**No. 25 Cr. 473 (JPO)**

**LOCAL RULE 16.1 CERTIFICATE OF COMPLIANCE**

I declare under penalty of perjury pursuant to 28 US C. § 1746 that defense counsel has conferred with counsel for the government in an effort in good faith to resolve by agreement the issues raised by this Motion without the intervention of the Court and has been unable to reach agreement.

*/s/ Jordan Estes*

Jordan Estes
New York Bar No. 4805172
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY
10166
(212) 351-2315
JEstes@gibsondunn.com