UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>JOSHUA WANDER,<br><br>              Defendant. | No. 25 Cr. 473 (JPO) |

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

JAY CLAYTON
United States Attorney
Southern District of New York

Marguerite B. Colson
Sarah Mortazavi
Alexandra N. Rothman
Assistant United States Attorneys

*- Of Counsel -*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.   Factual Overview ................................................................................................ 2

    B.   The Civil Suits and Agency Enforcement.......................................................... 5

    C.   The Indictment and Alfalla's Guilty Plea.......................................................... 6

    D.   The Motions ........................................................................................................ 7

ARGUMENT ....................................................................................................................... 7

I.    THE COURT SHOULD DENY THE DEFENDANT'S DEMAND FOR A BILL OF
PARTICULARS .......................................................................................................... 7

    A.   Applicable Law ................................................................................................... 8

    B.   Discussion ......................................................................................................... 10

        1.   The Court Should Deny the Request to Identify All Fraudulent Collateral ........ 12

        2.   The Court Should Deny the Request to Identify All Misrepresentations ............. 17

        3.   The Court Should Deny the Request to Identify All Co-Conspirators ................. 19

II.   THE COURT SHOULD DENY THE MOTION FOR DISCLOSURE OF THE FILTER
REVIEW PROCESS.................................................................................................. 21

    A.   Relevant Facts .................................................................................................. 22

    B.   Applicable Law ................................................................................................. 25

    C.   Discussion ......................................................................................................... 28

        1.   The Defendant Is Not Entitled to Further Information About the Filter Review
Process .............................................................................................................. 29

        2.   The Defendant Lacks Standing to Make Privilege Assertions........................... 33

        3.   The Defendant Has Not Established an Intentional Intrusion Into Privileged
Materials ........................................................................................................... 36

III.  THE DEFENDANT IS NOT ENTITLED TO PREMATURE DISCLOSURE OF JENCKS
ACT MATERIAL....................................................................................................... 39

CONCLUSION................................................................................................................... 41

i

# TABLE OF AUTHORITIES

*Bowne of New York City, Inc. v. AmBase Corp.*,
150 F.R.D. 465 (S.D.N.Y. 1993) ....................................................................................... 34

*Calvin Klein Trademark Tr. v. Wachner*,
198 F.R.D. 53 (S.D.N.Y. 2000) ......................................................................................... 26

*Coplon v. United States*,
191 F.2d 749 (D.C. Cir. 1951) ........................................................................................... 36

*Denney v. Jenkens & Gilchrist*,
362 F. Supp. 2d 407 (S.D.N.Y. 2004) ......................................................................... 27, 34

*In re Application of Sarrio, S.A.*,
119 F.3d 143 (2d Cir. 1997) ............................................................................................... 33

*In re von Bulow*,
828 F.2d 94 (2d Cir. 1987) ................................................................................................. 32

*In re Grand Jury Subpoena Duces Tecum*,
391 F. Supp. 1029 (S.D.N.Y. 1975) ................................................................................... 34

*In re Grand Jury Subpoenas*,
454 F.3d 511 (6th Cir. 2006) ............................................................................................. 37

*In re Search Warrants Executed on Apr. 28, 2021*,
No. 21 Misc. 425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) ..................... 24, 25, 32

*Montejo v. Louisiana*,
556 U.S. 778 (2009) ..................................................................................................... 25, 38

*Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*,
No. 19 Civ. 9193 (PGG), 2023 WL 315072 (S.D.N.Y. Jan. 19, 2023) ..................... 26, 27, 33

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
125 F.R.D. 47 (S.D.N.Y. 1989) .................................................................................... 34, 35

*United States v. Trippe*,
171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................................................................ 20

*United States v. Amendolara*,
No. 01 Cr. 694 (DAB), 2002 WL 31368279 (S.D.N.Y. Oct. 21, 2002) ............................. 19

*United States v. Avenatti*,
559 F. Supp. 3d 274 (S.D.N.Y. Sept. 9, 2021) .............................................................. 37, 39

*United States v. Bellomo*,
263 F. Supp. 2d 561 (E.D.N.Y. 2003) ................................................................................. 9, 12

*United States v. Bin Laden*,
92 F. Supp. 2d 225 (S.D.N.Y. 2000) ...................................................................................... 10

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ................................................................................. 7, 8, 12, 16

*United States v. Castillero*,
No. 23 Cr. 622 (JMF), 2025 WL 2959463 (S.D.N.Y. Oct. 20, 2025) ..................................... 39

*United States v. Ceglia*,
No. 12 Cr. 876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015) ..................................... 25

*United States v. Chalmers*,
410 F. Supp. 2d 278 (S.D.N.Y. 2006) ..................................................................................... 13

*United States v. Constr. Prods. Research, Inc.*,
73 F.3d 464 (2d Cir. 1996) ............................................................................................. 26, 33

*United States v. Coppa*,
267 F.3d 132 (2d Cir. 2001) ..................................................................................................... 39

*United States v. Dupree*,
781 F. Supp. 2d 115 (E.D.N.Y. 2011) ..................................................................................... 27

*United States v. Elbaz*,
396 F. Supp. 3d 583, 593 (D. Md. June 20, 2019) ................................................................. 32

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987) .......................................................................................... 9

*United States v. Gartner*,
518 F.2d 633 (2d Cir. 1975) ............................................................................................. 28, 36

*United States v. Gibson*,
175 F. Supp. 2d 532 (S.D.N.Y. 2001) ..................................................................................... 10

*United States v. Gonzalez*,
144 F.4th 396 (2d Cir. 2025) ................................................................................................... 37

*United States v. Henry*,
861 F. Supp. 1190 (S.D.N.Y. 1994) ........................................................................................ 12

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,
*AFL-CIO*, 119 F.3d 210 (2d Cir. 1997) ................................................................................. 26

*United States v. Krug*,
  868 F.3d 82 (2d Cir. 2017).................................................................................. 26

*United States v. Landji*,
  No. S1 18 Cr. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ........................ 37, 38

*United States v. Leech*,
  No. 24 Cr. 658 (GHW) (S.D.N.Y. 2026) ................................................................ 31

*United States v. Lumiere*,
  No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016)................................ 27, 28

*United States v. Lusterino*,
  450 F.2d 572 (2d Cir. 1971)................................................................................... 36

*United States v. Mahabub*,
  No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ...................................... 9

*United States v. Mandell*,
  710 F. Supp. 2d 368 (S.D.N.Y. 2010)............................................................. 8, 10, 17

*United States v. Matos-Peralta*,
  691 F. Supp. 780 (S.D.N.Y. 1988) ......................................................................... 11

*United States v. Middendorf*,
  No. 18 Cr. 36 (JPO) (S.D.N.Y. 2018)............................................................... passim

*United States v. Milton*,
  No. 21 Cr. 478 (S.D.N.Y. 2022) ...................................................................... passim

*United States v. Mitlof*,
  165 F. Supp. 2d 558 (S.D.N.Y. 2001)................................................................... 8, 9

*United States v. Mora*,
  No. 19 Cr. 514 (JPO), 2020 WL 7496281 (S.D.N.Y. Dec. 21, 2020) ..................................... 19

*United States v. Murphy*,
  No. 21 Cr. 280 (AKH), 2022 WL 1270958 (S.D.N.Y. Apr. 28, 2022) ............................... 8, 10

*United States v. Nachamie,*
  91 F. Supp. 2d 565 (S.D.N.Y. 2000)...................................................... 11, 16, 18, 20

*United States v. Neill*,
  952 F. Supp. 834 (S.D.N.Y. 1997) ........................................................................ 38

*United States v. Panza*,
  750 F.2d 1141 (2d Cir. 1984)................................................................................. 9

*United States v. Patel*,
No. 16 Cr. 798 (KBF), 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017)...................................... 28

*United States v. Rigas*,
258 F. Supp. 2d 299 (S.D.N.Y. 2003)...................................................................................... 9

*United States v. Rinsch*,
816 F. Supp. 3d 488 (S.D.N.Y. 2026)............................................................................... 18, 19

*United States v. Rispo*,
460 F.2d 965 (3d Cir. 1972)................................................................................................... 36

*United States v. Ritchey*,
605 F. Supp. 3d 891 (S.D. Miss. 2022).................................................................................. 32

*United States v. Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003)......................................................................... 8, 12, 19

*United States v. Rodriguez*,
No. 99 Cr. 367 (DLC), 1999 WL 820558 (S.D.N.Y. Oct. 13, 1999) ..................................... 20

*United States v. Samsonov*,
No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan 23, 2009)........................................ 9

*United States v. Schulte*,
No. 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019)..................................... 28

*United States v. Schwimmer*,
924 F.2d 443 (2d Cir. 1991)............................................................................................. 25, 28

*United States v. Sharma*,
No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019).................................... 37

*United States v. Torres*,
901 F.2d 205 (2d Cir. 1990)................................................................................................... 10

*United States v. Tournant*,
No. 22 Cr. 276 (LTS), 2023 WL 5276776 (S.D.N.Y. Aug. 15, 2023) .................................... 37

*United States v. Tucker*,
No. 19 Cr. 91 (PKC) (S.D.N.Y. 2016)................................................................................... 20

*United States v. Triana-Mateus*,
No. 98 Cr. 958 (SWK), 2002 WL 562649 (S.D.N.Y. Apr. 15, 2002) ...................................... 8

*United States v. Vaid*,
No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017)..................................... 16

*United States v. Wang*,
   No. 23 Cr. 118 (AT), 2024 WL 1251105 (S.D.N.Y. Mar. 22, 2024) ...................................... 16

*United States v. Weigand*,
   482 F. Supp. 3d 224 (S.D.N.Y. 2020)................................................................................... 25

*United States v. Weissman*,
   195 F.3d 96 (2d Cir. 1999).................................................................................................... 27

*United States v. Yousef*,
   327 F.3d 56 (2d Cir. 2003).............................................................................................. 25, 37

*von Bulow by Auersperg v. von Bulow*,
   811 F.2d 136 (2d Cir. 1987).................................................................................................. 33

**PRELIMINARY STATEMENT**

As alleged in the Indictment, the defendant Joshua Wander engaged in a scheme to defraud the lenders and investors of 777 Partners by making false and misleading statements regarding the firm's assets and financial condition. Among other things, the defendant pledged assets that 777 Partners had never purchased, or that had been pledged to other lenders, to extract hundreds of millions of dollars from his victims, and then used those monies to buy airplanes and professional sports teams abroad. When his fraud was exposed, the defendant lied, blaming the double-pledging of assets on a glitch in 777 Partners' antiquated computer system. In the end, the defendant's scheme drove 777 Partners to bankruptcy and caused hundreds of millions in losses.

The defendant now seeks a bill of particulars, information regarding the Government's filter team process, and early access to notes of a witness interview. The Court should deny each of his motions.

*First*, the detailed speaking Indictment, extensive discovery, and various pre-trial disclosures provide the defendant with more than sufficient information to prepare his defense and negate any need for a bill of particulars. In fact, the Government has already given the defendant much of the information he now seeks—namely, examples of double-pledged or non-existent assets, and specific misrepresentations the defendant made to his lenders. The defense may not, under the guise of a bill of particulars, obtain a sneak peak of the Government's trial evidence, exhibits or witnesses months before trial.

*Second*, the defendant's motion for disclosure of the Government's filter review process is nothing more than a fishing expedition and should be denied. As a threshold matter, the defendant has not even alleged that the prosecution team ever accessed records that are subject to any claim

of privilege, let alone one the defendant could assert. Absent any "spill" of privileged information, there is no basis to conduct discovery into a filter review process that operated as it should.

*Third*, the defense cannot use manufactured deficiencies in the filter review process to gain early access to Jencks Act material for 777 Partners' in-house counsel, Frederick Love. The Government will produce Jencks Act material for all witnesses, including Mr. Love, sufficiently in advance of trial to facilitate the defense's preparation. Nothing more is required.

The motions should be denied.

## BACKGROUND

### A.  Factual Overview

From 2021 to 2024, the defendant, who was the co-founder and co-managing partner of 777 Partners, defrauded 777 Partners' lenders and investors of more than $350 million. The defendant, and others acting at his direction, made false and misleading representations and fabricated financial documents to inflate the firm's financial performance, exaggerate its assets, and conceal the unsanctioned use of loan proceeds. Rather than spend lenders' monies to purchase structured settlements, as was required, the defendant fraudulently obtained monies to pay for airplanes, to purchase and cover expenses associated with professional sports teams that 777 Partners had acquired, and to pay 777 Partners' operating expenses. Ind. ¶ 9.

777 Partners was a private investment firm headquartered in Miami. Ind. ¶ 2. Initially the firm focused on underwriting and financing structured settlements and other non-traditional investments. Its business model was to fund the purchase of these structured settlements—as well as lottery winning payments, which are similarly structured—using debt financing collateralized by the future payments under the purchased settlements; combine a number of structured settlements into a trust; and then sell securities in the trust. *Id*.

2

As part of its business, 777 Partners—acting through a set of subsidiary entities, namely SuttonPark Capital—financed the structured settlement purchases using multiple credit facilities with private lenders. Wander negotiated the terms of those credit facilities, including the firm's collateral obligations, directly with the private lenders. The credit facilities restricted 777 Partners' use of borrowed funds to the purchase of structured settlements and operated on a borrowing base structure, permitting 777 Partners to borrow funds up to credit limits determined by the value of its pledged collateral. 777 Partners had credit facilities with three private lenders ("Lender-1," "Lender-2" and "Lender-3," and together, the "Victim Lenders"). Ind. ¶ 4.

To assure the Victim Lenders that their loans were fully secured,777 Partners was required to provide them with monthly compliance reports calculating the borrowing base predicated on the pledged collateral and cash on-hand. Ind. ¶ 5. Additionally, when 777 Partners borrowed funds from the credit facilities, the defendant, or someone acting at his direction, was required to represent to the Victim Lenders that there was a sufficient borrowing base and that the funds sought would be used in compliance with the terms of the credit facility. *Id.*

Beginning around 2018, the defendant began investing capital from the structured settlements business into new sectors with significantly more complex and less certain cash-flow profiles, including insurance firms, streaming platforms, airlines, and professional sports teams. Ind. ¶ 6. By 2021, the defendant's increased spending on aviation and other sectors outside of structured settlements, together with rising interest rates, served to reduce 777 Partners' cash and borrowing capacity. Nevertheless, and despite warnings from his employees, the defendant authorized multiple expenditures on new ventures the firm could not afford. As a result, 777 Partners routinely was unable to cover its operating expenses or payroll, service credit facilities, or complete the business acquisitions that the defendant had forecast to investors. Ind. ¶ 7.

As 777 Partners' borrowing capacity and excess cash dried up, the defendant directed 777 employees, including CFO Damien Alfalla, to use funds drawn from the credit facilities with the Victim Lenders for impermissible purposes, such as to pay for acquisitions and expenses of 777 Partners. Ind. ¶¶ 6-8, 10. Also at Wander's direction, 777 Partners recorded certain structured settlements as assets collateralizing multiple credit facilities, even though 777 Partners had never acquired those assets, nor had they entered into formal agreements to acquire those assets. Ind. ¶ 11. As just one example, in February 2022, the defendant told a subordinate to "anonymi[z]e" certain assets "w diff numbers" because "some are double pledged." All told, Wander pledged more than $350 million in structured-settlement receivables as collateral to the Victim Lenders, knowing that 777 Partners either did not own the collateral or had already pledged the collateral to other lenders. Ind. ¶ 1.

To conceal the scheme, Wander directed his employees to prepare false and misleading borrowing base compliance reports that misrepresented the amount of cash in 777 Partners' collection accounts, and the number of receivables pledged to the relevant lender. In truth, the compliance reports included pledged collateral that Wander knew 777 Partners had never acquired, or had pledged to a different lender, and thus was encumbered. Ind. ¶¶ 14-15. For example, in November 2022, a few days before an onsite diligence visit demanded by Lender-1, a 777 employee asked Wander about the "expected timing" on the pricing of a particular pool of receivables. Wander advised the employee, "Don't wast[e] time pricing that pool . . . It's fake." And during the diligence visit, Wander prided himself on concocting a cover-up story to hoodwink Lender-1, asking two of his subordinates, "how'd you like the story I spun?" In addition to directing employees to pledge fictious and already-encumbered assets, Wander told employees to falsely inflate the cash that 777 Partners had on hand, including by temporarily transferring funds

into an account for purposes of capturing misleading screenshots of bank account balances, and by digitally altering existing bank account records to make the balances appear higher. Ind. ¶¶ 16-17.

By March 2023, the defendant's scheme had started to unravel. Lender-1 uncovered that the defendant had double-pledged thousands of assets to Lender-2. Ind. ¶ 19. When Lender-1 confronted the defendant about this double-pledging, the defendant lied on recorded calls, falsely claiming, among other things, that the double-pledged assets were the result of a "screwup" caused by 777 Partners' "antiquated" computer system. Ind. ¶¶ 20, 21. In April 2023, Wander provided Lender-1 with a report that, for the first time, disclosed a borrowing base deficiency of nearly $200 million. The defendant acknowledged that the assets collateralizing the facility with Lender-1 had been double pledged and promised Lender-1 that new assets and proceeds from deals would arrive to reduce the shortfall in collateral, but those deals never came to fruition. Ind. ¶ 22. Meanwhile, Wander tried to hide the truth from Lender-2. In June 2023, when Lender-2 visited 777 Partners' offices to inspect Lender-1's files, Wander told a subordinate "Just make sure you don't include the double pledged" and "[t]ell them you can't get in touch with me . . . [t]hat I'm in the air."

In April 2024, an Australian airline owned by 777 Partners entered voluntary administration after aircraft lessors repossessed the airline's entire fleet of aircraft. Several other businesses in the 777 Partners' portfolio collapsed in the months that followed. In October 2024, the High Court in London issued a winding-up order, formally declaring 777 Partners bankrupt. Ind. ¶ 23.

**B. The Civil Suits and Agency Enforcement**

As 777 Partners was collapsing, civil litigation ensued. In May 2024, Lender-1 filed a civil complaint against Wander, 777 Partners, and others in the Southern District of New York. *See*

*Leadenhall v. Wander*, No. 24 Cr. 3453 (JGK) (S.D.N.Y.), Dkt. 187 (the "Leadenhall Am. Compl."). Declaration of AUSA Alexandra Rothman ("Rothman Decl."), Ex. A. In October 2024, Lender-3 filed a civil complaint against Wander, 777 Partners, and others, first in the Southern District of New York and then in Florida state court. *See ING Capital LLC v. 777 Partners*, No. 2025-1552-CA-01 (Fla. 11th Cir. Ct.), DIN 59 (the "ING Am. Compl."). Rothman Decl., Ex. B. The civil complaints allege, in substantial detail, a scheme by the defendant to double-pledge assets and conceal this double-pledging through the preparation of fraudulent monthly borrowing base reports, among other things. *Id.* Ex. A ¶¶ 1-312; Ex. B ¶¶ 1-139.

Document discovery has proceeded in both civil cases. Among other things, in the Leadenhall action, 777 Partners was ordered to answer Requests for Admission, in which they admitted that a list of roughly 3,000 specifically identified assets had been fraudulently pledged to Leadenhall. *See* 24 Civ. 3453, Dkt. 385 (S.D.N.Y. Nov. 4, 2025). And in the ING action, counsel for the defendant has deposed multiple witnesses who are likely to testify at trial, including former CFO Damien Alfalla.[1]

On October 16, 2025, the SEC brought a parallel civil action against the defendant. *SEC v. Wander*, 25 Civ. 8565 (VM) (S.D.N.Y.). The Government moved to intervene and stay discovery, which the court granted. *Id.* Dkts. 12, 46.

### C. The Indictment and Alfalla's Guilty Plea

On October 14, 2025, a grand jury sitting in this District returned a four-count Indictment charging the defendant with violations of Title 18, United States Code, Sections 1349 (wire fraud

---

[1] In May 2026, the state court in Florida granted the Government's motion to intervene and stay the Florida action for a period of six months. However, as noted above, fact discovery was nearly complete by the time of the Government's motion.

conspiracy), 1343 (wire fraud); 371 (conspiracy to commit securities fraud); and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud).

That same day, Damien Alfalla pled guilty, pursuant to a cooperation agreement, to an Information charging him with participating in the defendant's scheme to defraud the lenders and investors of 777 Partners.[2]

### D.  The Motions

On May 15, 2026, the defendant filed his pretrial motions. The defendant seeks a bill of particulars, ("BOP Mot." Dkt. 36), information about the Government's filter review process, ("Filter Mot." Dkt. 39), and notes from the Government's interviews of 777 Partners' in-house counsel, Frederick Love, (*id.*).

## ARGUMENT

### I.    THE COURT SHOULD DENY THE DEFENDANT'S DEMAND FOR A BILL OF PARTICULARS

The defendant demands to know every fictitious or double-pledged receivable, every false utterance, and every co-conspirator that could arise at trial. The motion should be denied. The defendant's catalog of demands is not a request for a bill of particulars but an improper attempt to preview and circumscribe the Government's trial proof.

The Indictment informs the defendant of the nature of the charges and allows him to plead double jeopardy. The Government has also armed the defendant with much more detail to assist his defense—including, at times, precise evidentiary nuance—through text-searchable discovery,

---

[2] The docket in *United States v. Alfalla* incorrectly reflects that Alfalla pled guilty on October 24, 2025. *See* 25 Cr. 468 (AS).

identification of the three Victim Lenders referenced in the Indictment, a list of double-pledged or non-existent collateral, and examples of specific false and misleading statements. The defendant also will receive expert disclosures, trial exhibits, a witness list, and Jencks Act material in advance of trial. Accordingly, the defendant has already obtained far more information about the nature of the allegations and, indeed, the Government's anticipated trial proof, than the law requires, and will receive still more as trial approaches.

### A. Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Murphy*, No. 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022) (citation and quotation marks omitted). Put otherwise, a bill of particulars is not required where an indictment "advises the Defendant[] of the nature of the charges against him," that is, "it describes with specificity the acts [the conspirators] allegedly committed and the nature of the conspiracy of which they are accused, and it explains (in language closely tracking that of the relevant statutes) the crimes alleged." *United States v. Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122 (S.D.N.Y. Aug. 17, 2018) (Op. & Order denying bill of particulars in a complex fraud scheme where defendants demanded a compendium of false representations and the identities of co-conspirators).

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and the acquisition of evidentiary detail is not its function. It is not

enough that the information "would be helpful" to the defendant. *Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122. Rather, "the 'ultimate test' for granting a bill of particulars is 'whether the information sought is necessary, not whether it is helpful.'" *Id.* (quoting Unit*ed States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (emphasis added)). As a general matter, if "the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574.

Furthermore, Rule 7(f) does not require the Government "to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed"—*i.e.*, 'information that would, in effect, give the defendant a preview of the Government's case before trial.'" *Id.* (quoting *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002); *see also United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories."); *Mitlof*, 165 F. Supp. 2d at 569 (collecting cases)).

It is for good reason that bills of particulars are justified only where the allegations in an indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. A bill of particulars "confines the Government's proof to particulars furnished," and as a result can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). "The [G]overnment's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise." *United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26,

2014); *see also United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan 23, 2009) (bill of particulars "must not be misused . . . to foreclose the Government from using proof it may develop as the trial approaches"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

Finally, the law does not "allow Defendants to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). Courts instead "must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery, and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) (citing *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000)).

## B. Discussion

The defendant's request for a bill of particulars should be denied because the Indictment, discovery produced to date, additional information provided by the Government, and allegations raised in related civil actions inform the defendant of the nature and specifics of the crimes of which he is accused and permit him to adequately prepare his defense. Courts "routinely" deny

10

motions for bills of particular where, as in this case, the charging document is sufficiently detailed and further notice has been supplied through discovery. *See, e.g.*, *United States v. Murphy*, 2022 WL 1270958, at *3; *Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122 ("no further detail required" where indictment delineated fraud scheme "with reasonable specificity" and Government provided extensive discovery).

Here, the seventeen-page speaking Indictment explains in-depth the nature of the defendant's scheme to defraud 777 Partners' lenders and investors to obtain money for unsanctioned uses. It includes references to and quotes from specific documents produced in discovery. *E.g.*, Ind. ¶¶ 20-21, 25. The Indictment alone requires denial of the motion. *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (overruled on other grounds). But the defendant has far more than the Indictment. He has voluminous, text-searchable discovery that has been produced with detailed cover letters to assist the defendant's review. He has a four-page letter that supplied, among other things, the identities of the Victim Lenders, the identities of relevant originators, a list of double-pledged assets to Lender-1, examples of specific misrepresentations by the defendant, and citations to particular pages produced in discovery (the "Particulars Letter"). Declaration of Jordan Estes in Support of Mot. for Bill of Particulars ("Estes BOP Decl."), Ex. F. He likewise has an eight-page letter from the Government that summarized, among other things, excerpts from witness interviews, including statements from Lender-1 and other employees at 777 Partners. Rothman Decl., Ex. C. And he has been party to civil actions arising from the same set of facts, through which he has gained access to copious civil discovery. Rothman Decl., Exs. A, B. All of this is more than sufficient to allow the defendant to prepare for trial.

The defendant gives the back of the hand to the Particulars Letter, claiming the Government "largely dismissed" his requests. BOP Mot. 7. Leaving aside that many of the demands were

11

irrelevant (*e.g.*, requesting the "date" the "scheme [] began", Estes Decl., Ex. E),[3] the Government hardly dismissed his requests. Rather, the Government identified multiple victims and two relevant originators, in addition to providing detailed information regarding pledged assets and representations as to 777 Partners' account balances.

Armed with a comprehensive picture of the fraud scheme, including the identities of the victims themselves, the defendant cannot credibly argue that he has not been apprised of the charges against him. Nor can he claim to be fumbling for evidentiary needles in a haystack, particularly when his own motion describes a "narrow[]" scheme, spanning "approximately two years," and involving only "three lenders to Sutton Park—a single subsidiary of a single portfolio company." BOP Mot. 1. The defendant nevertheless seeks more details regarding three categories of evidence. The aims of this request are as obvious as they are improper: (1) to obtain minute evidentiary detail about the Government's trial proof and, where possible, (2) constrain the Government's ability to present its case to the jury. Neither objective is permissible. *See*, *e.g.*, *Rittweger*, 259 F. Supp. 2d at 291; *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *Bellomo*, 263 F. Supp. 2d at 580.

### 1. The Court Should Deny the Request to Identify All Fraudulent Collateral

The Indictment alleges that between 2021 and 2024, the defendant and others he directed made false and misleading representations and fabricated financial documents to inflate 777

---

[3] *See, e.g.*, *United States v. Nachamie,* 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (quoting *United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) ("Since the government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme, and as the circumstantial proof on which the government usually relies to prove the existence of a scheme often does not reveal such details, the courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate.")).

Partners' financial performance and exaggerate its assets. *See* Ind. ¶ 1. The Indictment goes on to detail a scheme where the defendant and his co-conspirators defrauded three lenders by pledging non-existent and already-committed receivables as loan collateral in order to extract millions from the lenders. *Id.* ¶¶ 8-23. The defendant demands the Government provide an index of each and every receivable that was double-pledged or fictitious, claiming he is left "'unguided' as to relevant documents." BOP Mot. 9 (quoting *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987))). He is not. Only by assuming entitlement to the Government's trial proof and disregarding the detailed information already in his possession can the defendant profess ignorance as he does here.

The defendant complains that "the Indictment does not identify a single specific receivable alleged to be double-pledged or non-existent." BOP Mot. 8. No doubt the defendant would like the Government's anticipated exhibits concerning fraudulent receivables four months before trial. But the law is clear that an Indictment is not required to contain such information. And "the Government need not specifically 'inform a defendant of all transmissions it will use to prove a defendant's guilt at trial in a bill of particulars.'" *Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122 at 3 (quoting *United States v. Chalmers*, 410 F. Supp. 2d 278, 285 (S.D.N.Y. 2006)).

Moreover, the defendant ignores that the Indictment supplies more than enough detail to specifically identify collateral that 777 Partners fraudulently pledged to lenders. For example, Paragraph 9 of the Indictment alleges that in approximately May 2021, the defendant "provided Lender-1 with a list of structured settlements that 777 Partners claimed to own, but did not in fact have title to" and thereby caused 777 Partners to obtain over $40 million in funds from Lender-1. The defendant cannot make a straight-faced argument that he is unable to identify the collateral relevant to that episode when the Government has provided him: 1) the identity of Lender-1; 2) the date of the relevant compliance report; and 3) the amount of funding obtained from Lender-1.

13

Likewise, Paragraph 11 of the Indictment states that in approximately August 2021, the defendant engaged with a third-party originator to purchase a portfolio of structured settlements that Wander recorded as assets collateralizing the firm's borrowing from Lender-1, despite never having acquired them. While the Indictment gave the defendant the relevant date, the Government's Particulars Letter identified both Lender-1 and the third-party originator. Estes BOP Decl., Ex. F. To take another example, Paragraph 14 of the Indictment directs Wander to a specific borrowing request, identified by amount ($30 million), date (early 2022), and lender (Lender-3). The Indictment further specifies that the borrowing request was accompanied by a compliance report that identified over 250 assets double-pledged to Lender-1 or else never acquired. As to each of these examples, the defendant has more than enough detail to navigate to the relevant compliance reports and identify the pledged collateral.

Beyond the Indictment, the Particulars Letter and the related civil actions enable Wander to identify precisely which assets were double-pledged or never acquired. For example, the Particulars Letter provided the defendant exactly what he claims to lack: "a listing of assets double-pledged to [Leadenhall]" identified by Bates range. Estes BOP Decl., Ex. F. Likewise, the ING amended complaint points to a March 2022 loan package, consisting of a request to borrow $28.2 million and an accompanying compliance report purporting to identify 309 eligible receivables to be transferred to the borrower and pledged to ING Capital. According to the complaint, 273 of those receivables "did not exist at all" and thus could never be validly pledged to ING Capital. Rothman Decl., Ex. B ¶¶ 1, 58-63. The Leadenhall amended complaint also offers an in-depth account of the defendant's double-pledging scheme, even offering a "how-to" in tracing the history of a unique asset that had been double-pledged as early as September 2021. *Id.* Ex. A ¶¶ 172-73. That complaint further states that in March 2023, Leadenhall received a "list of assets pledged to

14

[Lender-2]." Upon reviewing that list, Leadenhall discovered that "1,600 assets worth approximately $185 million" had also been pledged to Leadenhall. *Id*. Ex. A ¶ 10-11. Even further, in the Requests for Admission in the Leadenhall action, 777 Partners has admitted that thousands of specifically identified assets were improperly pledged to Leadenhall—a list the defendant can easily consult if he has questions about fraudulently pledged collateral.

The Particulars Letter further directed the defendant to Bates ranges for a collection of 777 Partners' compliance reports submitted to Leadenhall, as well as recordings of March and April 2023 calls during which the defendant made false representations to Lender-1 regarding the double-pledged assets that Lender-1 had uncovered. On one of those calls, Wander was familiar with the double-pledged assets at issue, identifying them as belonging to a particular facility with Lender-2. On another, Wander admitted that 30% of Lender-1's collateral had been pledged to another lender.

To suggest the defendant will be left to conduct an "unfair audit of everything" absent a bill of particulars ignores all of the evidence available to the defendant. BOP Mot. 9. Rather, to identify other relevant receivables, his defense team has the straightforward task of reviewing the materials described above and navigating to the monthly compliance reports submitted to just three lenders over a confined period. The Government's discovery is text-searchable, and it is hardly herculean to cross-reference three compliance reports during a given month for the presence of simultaneously pledged assets that are uniquely identifiable. Moreover, Wander's admissions on the phone calls with Lender-1 demonstrate his own recall of double-pledged assets. It may be that SuttonPark had multiple lending facilities, BOP Mot. 2, and that "a single credit facility could contain thousands of receivables in its borrowing base at any given time," *id.* But that is irrelevant when the Government has directed the defendant to the precise lenders and facilities at issue in

15

this case, which contained far fewer receivables. Likewise, it is irrelevant that the Government has produced discovery "from more than fifty sources," BOP Mot. 8, when the records containing evidence of false collateral come from only a handful of sources: 777 Partners and the Victim Lenders. In any event, the Government's forthcoming expert disclosures will further identify and analyze the double-pledging of assets to assist the defense in advance of trial.[4]

This case does not remotely resemble *Bortnovsky*, in which the Government offered the defense no way to discern from the discovery or the Indictment which "of some fifteen burglaries would be demonstrated to be staged," because the Government itself was not certain. 820 F.2d at 574. The result was that the defendants in that case were left "unguided" to search for *three* fraudulent documents among thousands and then impermissibly burdened at trial to prove whether certain burglaries had, in fact, occurred. Nor is this case anything like *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000), or *United States v. Vaid*, No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017), which involved sprawling insurance-fraud schemes, multiple defendants, multiple co-conspirators, thousands of fraudulent claims and no way for the defendants to determine which claims the Government asserted were false. And in *United States v. Wang*, Judge Torres *denied* precisely the request the defendant seeks here: a full accounting of "every transfer that [the Government] contends was illegal." Instead, the Government was required to

---

[4] The defendant complains that the Government has not produced a "complete record of the MPFin data underlying each borrowing base report." BOP Mot. 6. This is misleading. The Government produced a copy of the backup of the MPFin system. *See* Declaration of Jordan Estes in Support of Mot. for Disclosure of Filter Review Process ("Estes Filter Decl."), Ex. A (citing SDNY_01_0001877). That production affords the defense access to all of the information in MPFin. When the defense had questions about how to access this data, the Government provided additional information to assist the defense's review. To the extent the defense has further questions about MPFin, the Government remains available to answer them.

provide only the specific accounts and entities at issue in an expansive RICO enterprise alleged to involve 44 entities and over 500 accounts. *United States v. Wang*, No. 23 Cr. 118 (AT), 2024 WL 1251105, at *5 (S.D.N.Y. Mar. 22, 2024). The Indictment, discovery, and Particulars Letter have laid out precisely how the fraudulent scheme was executed, identified the lender-victims of the scheme, and directed Wander's search into the specific collateral information he demands.

### 2. The Court Should Deny the Request to Identify All Misrepresentations

The Indictment alleges the defendant and others acting at his direction made false statements to the Victim Lenders and describes the purpose of those false statements: to obtain financing for the firm's operations, *id.* ¶ 1, 12, 13, and to conceal deficiencies in the firm's credit facilities, *id*. The defendant now demands that the Government disclose an index of each false statement the Government intends to introduce at trial, together with the statement's author, date, and whether it was made to obtain new funds versus retain funds. BOP Mot. 10, 12. Further, he claims that "courts regularly require that specificity." *Id.* at 10. They do not. In fact, courts routinely reject such claims for what they are—an "ill-disguised attempt at general pretrial discovery." *Mandell*, 710 F. Supp. 2d at 372 (rejecting defendant's demand for every alleged misrepresentation made to investors in case charging conspiracy to commit wire fraud and securities fraud). Where, as here, "the Indictment delineates [Wander's] scheme to defraud" 777's lenders "with reasonable specificity, and the Government has provided extensive discovery on [Wander's] relevant conduct, no further detail is required." *Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122 at 3 (rejecting defense request in wire fraud scheme for all wire transmissions and false representations the Government intended to use at trial).

Additional particularity relating to false statements is certainly not necessary for the defendant to prepare his defense. The Indictment clearly delineates the scheme to defraud. It specifies who was defrauded and when: the Victim Lenders between 2021 and 2024. It also

specifies *how* the scheme was executed—by submitting fraudulent compliance reports and fabricated financial documents to lenders—and furnishes specific instances of those false statements. For example, Paragraph 13 of the Indictment alleges that in approximately December 2021, the defendant negotiated for a portfolio of assets worth over $100 million. Although 777 Partners never purchased the assets in that portfolio, the defendant nevertheless caused them to be pledged as collateral to Lender-1. Paragraph 14 goes on to describe the defendant submitting a $30-million borrowing request to Lender-3 that pledged as collateral over 250 assets that were either pledged elsewhere or not owned by 777 Partners.

Where courts have ordered an accounting of false statements, they have found that neither the Indictment nor the discovery provided the requisite specificity to comply with the goals of Rule 7(f). *Nachamie*, for example, involved a sprawling healthcare fraud scheme that charged four defendants in 26 counts and involved 2,000 Medicare claims. In granting a bill of particulars, the court noted that the Government "had not yet informed the defendants which of these claims were false and in what way they were false." *Nachamie,* 91 F. Supp. 2d at 571. By his own admission, the defendant knows where to locate his false statements: "monthly borrowing compliance reports; drawdown certifications' screenshots of collection account balances; and statements in recorded phone calls." BOP Mot. 10. The Indictment also informs him *why* particular statements were false, *e.g.* Ind. ¶ 14 (collateral was double-pledged and non-existent), and the approximate dates the false statements were made, *e.g.* Ind. ¶¶ 20 (statements made on March 28, 2023 phone call); 21 (statements made on April 3, 2023 phone call). The defendant's requests fail based on the detailed information contained in the Indictment. But they are all the more extraordinary in light of the Government's Particulars Letter, which supplied substantial additional information about the Government's proof, including the Bates range of assets falsely pledged to Lender-1 and

identifying information for the originators who provided asset portfolios to 777 Partners that the defendant, in turn, pledged to lenders without ever acquiring the assets, Estes BOP Decl., Ex. F.

In any event, the defendant points to no case requiring the Government to disclose the *purpose* behind a particular false statement. Relying on *United States v. Rinsch*, 816 F. Supp. 3d 488, 491 (S.D.N.Y. 2026), the defendant claims that he needs the evidentiary minutiae of each false statement the Government intends to use at trial, because the Indictment is unclear as to which statements were made to obtain property, rather than to maintain property. BOP Mot. 11. This argument is a red herring. Statements to obtain *and* statements to maintain property are relevant to prove fraudulent intent, and the Government would be entitled to introduce both at trial. *Rinsch*, 816 F. Supp. 3d at 489. Put otherwise, both types of statements are fairly encompassed in the "perimeter of the scheme" that the defendant orchestrated, BOP Mot. 12, and nothing in Rule 7(f) requires the Government to delineate them. Even assuming it were relevant to distinguish between the two types of statements, the defendant need only look to the borrowing requests for the relevant facilities with the Victim Lenders. In demanding the details of each false statement the Government will introduce at trial, the defendant does not seek particulars necessary to his defense. He seeks an index containing the "who, what, when, and how" the Government will prove its case. But "[t]he Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." *United States v. Mora*, No. 19 Cr. 514 (JPO), 2020 WL 7496281, at *1 (S.D.N.Y. Dec. 21, 2020).

### 3. The Court Should Deny the Request to Identify All Co-Conspirators

Finally, the defendant demands to know the identities of all co-conspirators. Courts routinely deny blanket requests for the identities of all co-conspirators. *See, e.g.*, *Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122 (denying demand for identities of co-conspirators where fraud scheme

19

involved employees of two entities, focused on the conduct of six co-conspirators, and lasted two years); *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, No. 01 Cr. 694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases).

In light of the evidentiary detail in the Indictment, the Government need not specify who else may have been sufficiently culpable to be deemed a co-conspirator to enable the defendant to adequately prepare his defense. *See, e.g.*, *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying request for identification of co-conspirators where none were alleged to have committed any overt acts and identity of the conspiracy as a whole was clear; "[c]ourts have been highly reluctant to require a bill of particulars when defendants have asked for specific identities of co-conspirators or others allegedly involved"); *see also United States v. Tucker*, No. 19 Cr. 91 (PKC), June 3, 2016 Conf. Tr., at 9-10 (denying request for co-conspirator identities, reasoning that a bill of particulars "[i]s not an investigative tool. It's not a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.").

Cases in which such requests have been granted typically involve conspiracies "with a large number of co-conspirators over a long period of time." *Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122. The defendant's motion acknowledges as much. BOP Mot. 12 (citing *Nachamie*, 91 F. Supp. 2d at 573 (requiring Government to disclose identities of co-conspirators where the case involved "a large number of co-conspirators (eight defendants and an unknown number of co-conspirators) and the alleged conspiracy has operated for significant period of time (more than three years.)"). But this case involves neither. Rather, as in *Middendorf*, the charged conspiracy existed over a relatively limited timeframe, and focused on the conduct of limited participants, including cooperator Damien Alfalla, who has long been publicly identified.[5] *See Middendorf*, No. 18 Cr. 36 (JPO), Dkt. 122 at 4. As is routine, the Government will disclose a witness list and Jencks Act material sufficiently in advance of trial for the defense to adequately prepare. Accordingly, consistent with precedent in this Circuit and District, the defendant's request for the names of all co-conspirators, like the remainder of his request for further particulars, should be denied.

## II.    THE COURT SHOULD DENY THE MOTION FOR DISCLOSURE OF THE FILTER REVIEW PROCESS

The defendant next seeks discovery into the Government's filter review process "so Mr. Wander can assess whether the government properly protected his privileged communications." Filter Mot. 1. As the defendant can identify no intrusion into his privileged communications, there is no basis to "assess" the Government's filter process and his motion should be summarily denied.

---

[5] *See United States v. Alfalla*, No. 25 Cr. 468 (AS). In addition to Alfalla, the Indictment references just two financial analysts, *see* Ind. ¶¶ 15-17, both of whom worked closely with the defendant, and at least one of whom the defendant recently contacted in an attempt to influence his trial testimony.

21

### A.  Relevant Facts

In June 2025, pursuant to a grand jury subpoena, the Government obtained from 777 Partners the entire contents of the corporate email inboxes for the defendant and his co-managing partner, Steve Pasko, as well as data extracted from cellular phones used by the defendant and Pasko. After receiving the email and cellphone data, and before the prosecution team had access to any materials, a filter review was performed by a team separate from the prosecution team (the "filter team"). The filter team screened the data for potentially privileged materials (both 777 Partners' privilege and any personal privilege held by the defendant). The filter team then segregated all records it had identified as potentially privileged and released only non-privileged materials to the prosecution team.

On November 5, 2025, the Government made a Rule 16 discovery production, which included, among other things, all data extracted from the defendant's cellphone (nonprivileged and potentially privileged alike)[6] and the non-privileged materials from Pasko's phone. Estes Filter Decl., Ex. A. In its cover letter, the Government informed the defendant that it had used a "filter team" to screen for "potentially privileged materials." *Id*.

On November 24, 2025, the Government made another Rule 16 discovery production, which included, among other things, the entirety of the defendant's corporate email inbox as well as the non-privileged materials from Pasko's inbox. *Id.* Ex. B. Though potentially privileged materials from that production had been segregated by the filter team and remained inaccessible

---

[6] It is the Government's routine practice to produce the entirety of a defendant's account or device to that defendant so that the defendant can use all of his materials in aid of his defense. At the same time, the Government only has access to the nonprivileged subset of those records. As a result, through discovery the defendant often has access to records from his own account or device that are unavailable to the Government.

to the prosecution team—as with the November 5 production—the Government's November 24 production cover letter did not note the use of the filter team.

Five months later, on April 24, 2026, the defendant informed the Government that it had received "dozens of documents containing obviously privileged material," and, concluding that the prosecution team must have access to those privileged materials, "demanded" that the Government "immediately answer" a series of questions regarding the Government's filter review protocol. *Id.* Ex. I.[7] In the same letter, the defendant also demanded that the Government immediately provide all notes of any interviews with in-house counsel, Frederick Love. *Id.*[8]

On April 28, 2026, the Government responded to the defendant's letter. The Government explained that the defense was mistaken that the prosecution team had inadvertently accessed potentially privileged communications, writing:

> As a threshold matter, you are mistaken that the Government has accessed "dozens of documents containing obviously privileged materials." (April 24 Ltr. at 1). The Government's discovery production to you contains materials that a filter team had screened from the prosecution team as potentially privileged. Those materials, which include the document you identified, USAO_REL_01_00241943, are not now (and have not been) accessible to the prosecution team. Notwithstanding the fact that the Government does not have access to those records—and they are not therefore in the possession, custody, or control of the prosecution team for purposes of Rule 16 obligations—these potentially privileged materials were produced to you as a courtesy so as to assist you in preparing a defense.

---

[7] The defendant's letter identified one document as potentially privileged, USAO_REL_01_00241943. Estes Filter Decl., Ex. I. As the Government informed the defense, that document was segregated from the prosecution team. *Id.* Ex. J.

[8] The defendant acknowledged in its demand letter that the Government had previously produced excerpts from Love's interviews (along with other witnesses) as part of its pretrial disclosures. Estes Filter Decl., Ex. I; *see* Rothman Decl., Ex. C (under seal).

23

Estes Decl., Ex. J. The Government provided the defense with an Excel file that identified by Bates number each of the approximately 350,000 documents from the defendant's inbox that had been screened from the prosecution team as potentially privileged but produced to the defense. *Id.*

The Government also noted that it was not obvious that the defendant had any personal privilege over the communications discussed in his letter:

> Turning to your privilege assertions, it is not evident to us that Mr. Wander is the holder of the privilege and is entitled to any such information. To the extent any of the potentially privileged materials are in fact privileged, the Government understands the privilege to be a corporate privilege held by 777 Partners LLC or its subsidiaries, whom you do not represent.[1]
>
> …
>
> To the extent Mr. Wander identifies any materials apart from those identified in the attached Excel document as to which Mr. Wander intends to assert a personal privilege or work-product claim, please identify the potentially privileged documents by Bates number as soon as possible and produce a detailed privilege log . . . no later than **May 15, 2026.**
>
> **[1]** It appears the filter team inadvertently produced to you materials subject to a potential claim of privilege by 777 Partners. If, as your letter suggests, you are concerned about respect for 777 Partners' privileged materials, we encourage you to return those materials to 777 Partners as soon as practicable.

Estes Filter Decl., Ex. J.

The defendant did not respond to the Government's letter and did not produce a privilege log to identify which communications within the discovery production might be subject to a claim of personal privilege. The defendant then filed the instant motion, in which it asks the Court to order the Government to produce (1) the filter team protocol and documentation regarding how the privilege review and document handling failed; (2) information sufficient to show whether the

24

process failed at any other point in the review; and (3) notes of the Government's interviews of Love. Filter Mot. 2.[9]

### B. Applicable Law

1. Filter Team Review

"The use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications." *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (denying a pre-indictment "request for detailed information about the filter team review process"); *United States v. Ceglia*, No. 12 Cr. 876 (VSB), 2015 WL 1499194, *1 (S.D.N.Y. Mar. 30, 2015). "[T]he filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects and their clients." *In re Search Warrants Executed on Apr. 28, 2021*, 2021 WL 2188150, at *2; *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("[T]he Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys."), overruled on other grounds by *Montejo v. Louisiana*, 556 U.S. 778 (2009).

Details of the Government's filter review process are not ordinarily subject to disclosure through Rule 16. *See United States v. Weigand*, 482 F. Supp. 3d 224, 246 (S.D.N.Y. 2020), as corrected (Sept. 2, 2020) ("Under these circumstances, a 'taint protocol' is not 'material to preparing the defense' and so does not fall within the scope of Rule 16(a)(1)(E)."). Denial is appropriate where a "motion for an evidentiary hearing on the government's filter team protocols

---

[9] The Government responds to the defense's request for the notes of Love's interviews below. *See infra* Part III.

. . . is based primarily on surmise." *United States v. Milton*, No. 21 Cr. 478 (ER), Dkt. 168 at 8 (S.D.N.Y. Sept. 8, 2022).

### 2.  Attorney-Client Privilege

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. The Sixth Amendment is violated when the Government intentionally interferes with the attorney-client relationship. *See United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991).

"To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). "The party asserting the privilege must establish the essential elements of the privilege." *Id.*

The privilege "must be narrowly construed" because it "stands in derogation of the search for truth so essential to the effective operation of any system of justice." *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000); *see also United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, *AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997) ("[S]ince the attorney-client privilege stands in derogation of the public's right to every man's evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." (quotation marks omitted)).

### 3.  Joint Defense Privilege

"The joint defense privilege . . . is an extension of the attorney[-]client privilege." *United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (citation and internal quotation marks omitted). It applies "where a joint defense effort or strategy has been decided upon and undertaken by the

parties and their respective counsel." *Id*. (citation omitted). For the privilege to apply, the communications must have been "made in the course of an ongoing common enterprise and intended to further the enterprise." *Id.* "Of course, the communication itself must, in the first instance, be protected by the attorney-client privilege or the work product doctrine, for the common interest doctrine to apply." *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, No. 19 Civ. 9193 (PGG), 2023 WL 315072, at *8 (S.D.N.Y. Jan. 19, 2023). "The common interest doctrine is narrowly construed, and the Second Circuit has cautioned that expansions of the attorney-client privilege under the common interest doctrine should be cautiously extended." (internal citation and quotation marks omitted). *Id.*

The defendant "bears the burden of showing that there was an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy." *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004). (citation and internal quotation marks omitted). Critically, "[s]ome form of joint strategy is necessary to establish a JDA, rather than merely the impression of one side[.]" *United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999). "[I]t is not enough merely to show . . . interests in common" or that the defendant and 777 Partners "shared concerns about potential litigation." *Denney*, 362 F. Supp. 2d at 415. Even in cooperative arrangements where "[i]nformation [is] shared and strategy developed in concert," it may still fall short of establishing the requisite joint defense agreement. *Weissman*, 195 F.3d at 100. The defendant "must show some agreement, whether formal or informal, written or unwritten, to pursue a joint legal defense" which requires "some *meeting of the minds* between the parties" and that "the particular communication at issue was disclosed in connection with the joint legal defense." *Denney*, 362 F. Supp. 2d at 415.

4.  Remedies

"Inadvertent disclosure of potentially privileged information to the prosecution team is not alone a basis for relief." *Milton*, No. 21 Cr. 478 (ER), Dkt. 168 at 8; *see also United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (after-the-fact notice of potentially privileged documents did not render an earlier search invalid). "[T]he mere fact that the government obtained privileged information does not mean it violated defendants' Sixth Amendment rights." *United States v. Dupree*, 781 F. Supp. 2d 115, 163 (E.D.N.Y. 2011) ("[T]he mere fact that the government obtained privileged information does not mean it violated defendants' Sixth Amendment rights[.]").

Where privileged material passes to the prosecution team, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial." *Lumiere*, 2016 WL 7188149, at *6 (quotation marks omitted); *see also United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *2 (S.D.N.Y. Oct. 18, 2019) (same); *United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *6 (S.D.N.Y. Aug. 8, 2017) (same). Even when there is intentional intrusion, "unless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." *Schwimmer*, 924 F.2d at 447 (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)).

**C.  Discussion**

The defendant's motion springs from a fundamental misunderstanding: the defendant mistakenly assumed that the prosecution team had access to all the materials he had been produced in discovery. In fact, it did not: the defendant received his full email inbox and all data from his cellphone, but the prosecution team received filtered sets that excluded potentially privileged

28

material. Unwilling to accept that reality, the defendant demands discovery into the Government's filter team process, insisting that it must have failed because the *defendant* received potentially privileged materials in discovery. But having identified no intrusion into his privilege by the prosecution team, let alone any potential prejudice to him or his defense whatsoever, the defendant supplies no basis to explore the Government's filter team process.

1. The Defendant Is Not Entitled to Further Information About the Filter Review Process

Rule 16 does not permit a defendant to demand information about the Government's internal processes, such as filter team protocols and instructions, whenever he wishes to assess their quality. *See* Fed. R. Crim. P. 16. Filter team procedures become relevant, if ever, when a court is called upon to evaluate whether the Government's intrusion into a defendant's privileged communications was "manifestly and avowedly corrupt conduct," *Schwimmer*, 924 F.2d at 447, such that the defendant's Sixth Amendment right to counsel or his Fifth Amendment due process rights have been impaired. *See infra* Part II.C.3. In the absence of any intrusion into the defendant's privileged communications, however, whether and how the Government employed a filter team is entirely irrelevant.

Here, the defendant has not substantiated his allegation that the prosecution team had access to any materials that the defense claims may be privileged, so his motion fails from the start. Although the defendant claims there are 152 documents that are "potentially privileged," Filter Mot. 1, the defense has neither supplied a privilege log identifying these documents nor expressly alleged that these documents were ever released to the prosecution team. Of the four documents the defense has identified to date as subject to a potential claim of privilege, the Government confirms that none were released to the prosecution team. *See* Estes Filter Decl., Exs.

29

F, G, H, I; *see also id.* Ex. J. In other words, the defense has not identified any privileged communication that has been released to the prosecution team.

In response, the defense essentially argues that the court should not accept the Government's assurance that the prosecution team did not access the potentially privileged materials screened by the filter team. Counsel claims that the Government "provided no bases" to support the "claim[] that these materials had been screened from the prosecution team and were inaccessible to that team[.]" Filter Mot. 5. But Government counsel informed the defense by letter that it used a filter team—and now makes the same representation to the Court—and the Government further supplied Bates numbers reflecting the materials that had been screened and segregated. Nothing more is required.

Unable to point to any particular privileged document released to the prosecution team, the defendant pivots to attack the filter process generally, arguing the "government's filter process broke down the moment they produced materials that were supposed to be segregated to Mr. Wander, as the government itself admits." Filter Mot. 6. The defendant is mistaken yet again. The Government may have produced the defendant's entire inbox to him in discovery, but that is not a failure in the filter process. The Government chose to produce to the defendant his entire inbox to comply with its Rule 16 obligations, to avoid inadvertently withholding any *Brady* material, and to quickly enable access to discovery materials. The filter team segregated potentially privileged materials from prosecution team. The filter process did not break down when the defendant received his own emails, including those that may be subject to 777 Partners' privilege, but the prosecution team did not; to the contrary, the filter process worked as intended.

Because the defense has failed to identify any release of privileged materials to the prosecution team, this case is unlike the cases cited by the defense in which the Government

30

produced (either voluntarily or pursuant to court order) further information about its filter review. *See* Filter Mot. 6-9. In each circumstance cited by the defendant the court had reason to evaluate whether an intrusion into privileged matters was intentional or inadvertent:

In *United States v. Milton*, No. 21 Cr. 478 (ER), for example, the prosecution team acknowledged to the defense and the Court that, despite using a filter team to screen for potentially privileged materials, a prosecution team member had viewed potentially privileged materials in search warrant returns. As a result, and while explicitly telling the defense that "there is no legal basis for disclosure of . . . information [] regarding the filter's teams processes and procedures," Rothman Decl., Ex. D at 1, the Government provided the defense with a list of search terms that were used to screen materials. The Government later disclosed further errors by the prosecution team; among other things, members of the prosecution team had access to hundreds of potentially privileged communications, including several communications with members of the defendant's defense team. *Id.*, Ex. E at 1-2. Notwithstanding those disclosures, the court in *Milton* still denied the defendant's request for an evidentiary hearing on the Government's filter team protocols. No. 21 Cr. 478 (ER), Dkt. 168 at 8. Here, by contrast, and despite months having passed since the Government first produced these materials to the defense, the defense has failed to identify any potentially privileged document screened through the filter team to which the prosecution team may have had access.

*United States v. Leech*, No. 24 Cr. 658 (GHW) (S.D.N.Y. 2026), is even further afield. There, additional inquiries into the filter team process were rooted in particularized and undisputed allegations that the case team had had access to documents over which the defendant asserted a personal privilege. Before the Government was required to make its disclosures, the defendant had to first substantiate its claims that privileged records had been accessed by the prosecution team,

31

resulting in the filing of multiple declarations by retained attorneys, consultants, and the defendant, explaining the basis for the privilege claim, including a detailed privilege log. (Dkt. 66 (Jan. 7, 2026 declaration attaching privilege log of "materials as to which Mr. Leech asserts privilege and that . . . were accessed by the Assistant United States Attorneys in charge of this prosecution")); *id.* (Dkt. 68 (declaration of the defendant setting forth facts substantiating his claim of privilege)); *id.* (Dkts. 67, 70 (attorney declarations)). The defense has done nothing of the sort.

The same is true for *United States v. Elbaz*, an out-of-district case that the defense also cites. In *Elbaz*, there was specificity regarding the claimed release of purportedly privileged materials to the prosecution team: of 100 documents loaded onto a review platform and accessible to the case team, two that implicated the defendant's personal privilege "were viewed by a member of the Prosecution Team" for approximately 17 seconds, and that individual subsequently submitted a declaration stating that she "does not remember seeing the" contents of the email and "did not provide the" documents "to other members of the Prosecution Team" or otherwise discuss those documents with the rest of the Prosecution Team. 396 F. Supp. 3d 583, 593 (D. Md. June 20, 2019). No such circumstances have been alleged here.[10]

In sum, the defendant has not even come close to making the requisite showing to be entitled to further information about the Government's filter review process.

---

[10] The defendant also cites *United States v. Ritchey*, 605 F. Supp. 3d 891, 901 (S.D. Miss. 2022), for the commentary that the Court "question[ed] the adequacy of the filter team protocol" that was "unilaterally" adopted by the Government. *Id.* That skepticism stands in sharp contrast to the views of judges in this District, where filter protocols are routinely employed by the U.S. Attorney's Office, and multiple judges, including this Court, have approved of the practice. *See, e.g.*, *In re Search Warrants*, 2021 WL 2188150, at *2 ("The use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications.").

2.   The Defendant Lacks Standing to Make Privilege Assertions

The defendant's motion also founders because any privilege associated with the materials he focuses on belongs to 777 Partners, not the defendant.

The defendant may not vicariously claim privilege over documents if he is not the privilege holder. "[T]he [attorney-client] privilege belongs solely to the client." *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987). "It can be asserted only by the client (or one authorized to do so on the client's behalf)." *In Re Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997). Thus, even if the defendant had alleged a release of privileged documents to the case team, he would have to establish that he is the appropriate privilege holder qualified to assert a claim of privilege over whatever records he claims were subject to a spill. *See Constr. Prods. Research, Inc.*, 73 F.3d at 473 ("The party asserting the privilege must establish the essential elements of the privilege.").

In response, the defendant argues that he shares a common interest privilege with 777 Partners because he was in a joint defense agreement with the company as to three civil matters, which he argues implicate his personal privilege. Filter Mot. 2 (citing *Change Lending, LLC v.777 Partners LLC*, No. 650118/2024 (N.Y. Sup. Ct. Jan. 9, 2024); *Obra Cap. Mgmt., LLC v. 777 Partners LLC*, No. 651220/2024 (N.Y. Sup. Ct. Mar. 7, 2024); and *Leadenhall Cap. Partners LLP v. Wander et al.*)). The defendant's self-serving and unsupported invocation of a common interest privilege is meritless for a number of reasons.

As an initial matter, the defendant's bare assertion that he is or was in a joint defense agreement with 777 Partners is legally insufficient. A defendant cannot discharge his burden to prove the existence of a joint defense agreement by proffers in motion papers. "The party invoking the doctrine must make this [joint defense] showing based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence." *Monterey Bay Mil. Hous., LLC*, 2023 WL 315072, at *8 (citation and internal quotation marks omitted). "That

33

burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) (citation omitted). In short, claims of a common interest privilege are appropriately rejected where the proponent "offers no affidavits addressed to the underlying facts on which it purports to premise its claims of" privilege, or otherwise fails to "cite any specific deposition testimony or other competent evidence on which it might rely" to support its invocation. *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 472 (S.D.N.Y. 1993). The defendant's say-so is not enough to establish a common interest privilege, and absent that, he has no standing to either allege a spill, or to request further information on the filter process.

Even had the defendant established that he was in a joint defense agreement with 777 Partners as to the three civil matters he has identified, he has not demonstrated that any of the communications he perceives to be at issue have some "connection with the joint legal defense," *Denney*, 362 F. Supp. 2d at 415, rather than communications made in the defendant's capacity as an officer of 777 Partners. The defendant may not invoke 777 Partners' privilege by virtue of having served as its corporate officer. *See In re Grand Jury Subpoena Duces Tecum*, 391 F. Supp. 1029, 1034 (S.D.N.Y. 1975) (an executive "cannot assert the attorney-client privilege as to matters involving the affairs of the [corporation], or embracing his role or activities as an [] officer or director."); *see also Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y. 1989) ("Any privilege that exists as to a corporate officer's role and duties within the corporation belongs to the corporation, not the officer. Likewise, a corporate officer or director may not prevent a corporation from waiving its privilege by exercising that privilege individually." (internal citations omitted)).

34

Moreover, the facts surrounding these lawsuits and the defendant's apparent liability negate any implication that the contents of the defendant's corporate inbox—dating back to mid-2024—contains communications relating to a purported joint defense agreement. For example, in *Obra Cap. Mgmt., LLC*, Wander was never a named defendant, *id.* Dkt. 2, and thus there is no basis to find that the defendant's personal privilege was implicated at all with respect to this matter. In *Change Lending, LLC*, Wander was not named as a defendant until February 13, 2025, and no lawyer entered an appearance on Wander's behalf until months later, *id.* Dkts. 113, 357. That timeline post-dates the defendant's resignation from 777 Partners and the last dated email from Wander's inbox that was released to the prosecution team by the filter team, which was dated June 5, 2024. And finally, in *Leadenhall Cap. Partners LLP*, two attorneys, Jordan Estes (his counsel here) and Marjorie E. Sheldon, entered appearances on the defendant's behalf on June 20, 2024, which likewise post-dated his resignation and the last-dated email produced to the prosecution team from the defendant's corporate inbox. *Id.* Dkts. 131, 132.[11] Thus, again, there is no reason to believe that communications related to that representation would be found in the defendant's inbox, nor has the defendant alleged otherwise.

Because the defendant has not established that he is the privilege holder, he cannot claim any intrusion of his privilege and thus any reason to evaluate the Government's filter process.

---

[11] The case caption on the docket for that matter suggests that John G. McCarthy was the lead counsel representing Wander in his personal capacity; however, that appears to an error: McCarthy's May 14, 2024 notice of appearance notes McCarthy's appearance on behalf of the corporate defendants, *i.e.*, 777 Partners and its subsidiaries, but not Wander. No. 24 Civ. 03453 (JGK), Dkt. 69.

3. The Defendant Has Not Established an Intentional Intrusion Into Privileged Materials

Even if the defense could make a showing that the prosecution had access to potentially privileged information, and even if he were qualified as the appropriate privilege holder to make such a claim, the motion should nonetheless be denied because the defendant's Sixth Amendment rights were not violated.

To make out a Sixth Amendment violation, the defendant must establish that the Government's access to any privileged material was a "manifestly and avowedly corrupt" intrusion on the defendant's Sixth Amendment rights, and that the defendant suffered some prejudice as a result. The Second Circuit has characterized "manifestly and avowedly corrupt" conduct as actions that might invoke a "per se rule [that] represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt." *Gartner*, 518 F.2d at 637. Such a rule applies where the government's "conduct has been an offensive interference with the defendant's rights without any justification." *Id.* As examples of Government conduct that might meet this standard (while still eschewing a *per se* rule), the Second Circuit has pointed to cases where the Government tried multiple defendants, including one who, unbeknownst to his co-defendants or even his attorney, was a Government informant, *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972), where the Government tried an informant along with a codefendant and the informant professed his own and his codefendant's guilt in front of the jury, *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971), and where the Government wiretapped conversations between a defendant and her counsel before and during trial, *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951).

The defendant does not come close to alleging "manifestly and avowedly corrupt conduct." Indeed, the Government's conduct was the opposite. The Government took steps to protect the

36

defendant's privilege, including: (1) instituting a filter team to review and screen out potentially privileged materials; (2) segregating all materials identified as potentially privileged materials from the prosecution team; and (3) requesting from defense counsel a privilege log enumerating the documents that he believes were subject to a personal privilege and released to the case team.

The Government's measures demonstrate its good faith efforts to avoid exposing the prosecution team to privileged material. But even if the filter team had inadvertently released privileged material, the very use of a filter team negates a finding of intentional intrusion on the attorney-client privilege. *See United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *15 (S.D.N.Y. Aug. 15, 2023) ("[I]n determining whether the government has intruded upon privilege, courts often consider whether the prosecution took reasonable precautions to avoid exposure to privileged materials."); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *3 (S.D.N.Y. Aug. 13, 2019) (finding no intentional intrusion on the attorney-client privilege when Government used filter protocol for materials that it knew may contain privileged communications). Moreover, even in cases in which the case team did *not* employ a filter team to review potentially privileged material, courts in this District have declined to find constitutional violations. *See United States v. Landji*, No. S1 18 Cr. 601 (PGG), 2021 WL 5402288, at *23-24 (S.D.N.Y. Nov. 18, 2021), *aff'd sub nom. United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025) (finding no "reckless disregard" for defendants' Sixth Amendment rights after case agents' "cursory review" of privileged material).

To find otherwise would contravene this Circuit's caselaw approving the Government's use of filter teams. Far from an intentional invasion of the privilege, courts in this District consistently recognize, "[w]here the Government has obtained potentially privileged material, use of a filter team constitutes an action respectful of, rather than injurious to, the protection of

privilege." *United States v. Avenatti*, 559 F. Supp. 3d 274, 282 (S.D.N.Y. Sept. 9, 2021) (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006)). Indeed, the use of a filter team has been deemed adequate protection of potentially privileged material obtained by the Government time and again in cases in this District. *Id.*; *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) (finding "the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys" in case in which government received notes and information from a jailhouse informant about defendants), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009).

The defense has separately failed to articulate what prejudice he suffers under these circumstances, where he has failed to identify any potentially privileged documents the Government reviewed, let alone those that would have given the Government useful insight into his trial strategy. As noted above, *see supra* Part II.C.1, the only four documents the defense has identified to date were not accessible by the prosecution team. Estes Decl. Exs. F, G, H, I. Even in cases where privileged documents *were* reviewed by the case team, courts have nonetheless declined to find prejudice. *See Milton*, No. 21 Cr. 478 (ER), Dkt. 168 at 8; *Landji*, 2021 WL 5402288, at *27 (refusing to presume prejudice even when Government had access to "highly sensitive, attorney work product material" laying out proposed trial strategy for defendant); *United States v. Neill*, 952 F. Supp. 834, 841-42 (S.D.N.Y. 1997) (no prejudice when case team reviewed potentially privileged materials identifying entities and persons but not trial strategy).

Because the defendant has failed to allege that he is entitled to any further discovery, and because he has failed to allege that there was any "failure" in the filter process that resulted in an intentional intrusion and prejudice to him, the defendant's motion should be denied.

### III.    THE DEFENDANT IS NOT ENTITLED TO PREMATURE DISCLOSURE OF JENCKS ACT MATERIAL

Finally, the defendant seeks the production of notes of the Government's interviews with Frederick Love, in-house counsel at a subsidiary of 777 Partners, or, at a minimum, "production of the steps the government took to protect privileged information" during the interviews. Filter Mot. 8-9. This request is a transparent ploy for the early production of Jencks Act material. It should be denied.

It is well-settled that the Jencks Act "prohibits a District Court from ordering the pretrial disclosure of witness statements." *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001). For this reason, courts routinely deny requests, such as the defendant's, for the early production of notes of witness interviews. *See, e.g.*, *Avenatti*, 559 F. Supp. 3d at 285. The Government will produce Jencks Act material for all trial witnesses, including Love, and has offered to the defense that it will produce these materials in advance of trial pursuant to a mutually agreeable pretrial disclosure schedule.

Seeking an end-run around the well-established rules in this Circuit, the defendant argues that he is entitled to Love's interview notes now because of the filter team's "handling of documents" in this case. Filter Mot. 8. It is not obvious what one issue has to do with the other. In any event, there were no failures in how the filter team screened the materials from 777 Partners for potentially privileged materials, *see supra* Part II.C.1, so there is no reason to order the premature disclose of Love's interview notes.

Nor does the defendant assert, as he would need to before raising a potential privilege claim with respect to Love's interviews, that Love ever represented the defendant in his personal capacity or that Love participated in the defense of the three civil suits named above. As the defendant concedes in his motion, Love "was an attorney for a 777 Partners portfolio company, SuttonPark,"

39

Filter Mot. 8; he was not the defendant's personal counsel. In other words, the defendant's request for Love's interview notes suffers from the same deficiencies as his broader request for information about the filter review process, namely, 777 Partners, and not the defendant, is the privilege holder. The defendant is consequently unqualified to assess the disclosure of privileged information as to Love. *See United States v. Castillero*, No. 23 Cr. 622 (JMF), 2025 WL 2959463, at *8 (S.D.N.Y. Oct. 20, 2025) (rejecting argument that "proffer notes . . . contain information shielded by the attorney-client privilege" where the defendants failed to show that a witness "revealed information shielded by their *individual* privileges"); *see also supra* Part II.C.2.

Finally, the defendant cites no authority for the proposition that he is entitled to information about the "guardrails" that were in place to protect potentially privileged information during Love's interviews or, indeed, for any interview of an in-house attorney. Filter Mot. 2. As defense counsel is aware, interviews of in-house counsel for corporations are routine, and Love was represented by competent counsel during his interviews with the Government, Rothman Decl., Ex. C at 7 (filed under seal). The defendant raises the alarm that "[n]o filter team was present at these interviews," but that is unsurprising. Filter Mot. 9. Love was interviewed in July and October 2024, several months before 777 Partners first produced potentially privileged materials to the Government and the filter team was first engaged to review those materials.[12] The motion should be denied.

---

[12] In a footnote, the defendant claims that "discovery [] shows that 777 employees believed that Fred Love had potentially disclosed privileged and otherwise sensitive information outside the Company." Filter Mot. 9 n.2. Whatever some unnamed 777 employees may or may not believe about Love is entirely irrelevant to the Government's disclosure obligations.

## CONCLUSION

For the foregoing reasons, the defendant's motions should be denied.

Dated:  New York, New York
        June 12, 2026

                        Respectfully submitted,

                        JAY CLAYTON
                        United States Attorney

By:     _____
                        Marguerite B. Colson
                        Sarah Mortazavi
                        Alexandra N. Rothman
                        Assistant United States Attorneys
                        (212) 637-2587 | -2520 | -2580

41