Filing # 222839397 E-Filed 05/09/2025 06:56:43 PM

**IN THE CIRCUIT COURT**
**OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

ING CAPITAL LLC,                                    CASE NO: 2025-1552-CA-01

Plaintiff,

vs.

777 PARTNERS LLC, 600 PARTNERS
LLC, SUTTONPARK CAPITAL LLC,
SUTTONPARK SERVICING LLC, JOSH
WANDER, STEVEN PASKO, and
FREDERICK LOVE,

Defendants.

_____

**Amended Complaint**

Plaintiff, ING Capital LLC ("ING Capital"), as and for its Complaint against Defendants, 777 Partners LLC ("777 Partners"), 600 Partners LLC ("600 Partners," and together with 777 Partners, the "777 Defendants"), SuttonPark Capital LLC ("SuttonPark Capital"), SuttonPark Servicing LLC ("SuttonPark Servicing," and together with SuttonPark Capital, the "SuttonPark Defendants"), Josh Wander ("Wander"), Steven Pasko ("Pasko"), and Frederick Love ("Love," and together with Wander and Pasko, the "Individual Defendants," and collectively with the SuttonPark Defendants and the 777 Defendants, the "Defendants"), alleges as follows:

**Nature of the Action**

1.      This is a civil action to recover more than $28 million in loan proceeds that ING Capital advanced to an entity named Sierra 2016, LLC ("Sierra 2016"), based on a fraud Defendants perpetrated.  Sierra 2016 is the borrower under a credit agreement with ING Capital and is owned and controlled by SuttonPark Capital, an affiliate of the 777 Defendants.  Defendants

induced ING Capital to make this loan in March 2022 via fraudulent representations that the loan proceeds would be used by Sierra 2016 to acquire a portfolio of 309 structured settlement receivables from SuttonPark Capital, which in turn would be used to repay the loan and provide security to ING Capital.

2.     Defendants had no intention of using the loan proceeds as they had represented.  At least 273 of the receivables purportedly to be acquired were not in fact owned by SuttonPark Capital and were never assigned to Sierra 2016, leaving ING Capital with a significant collateral shortfall.  The bulk of the loan proceeds were siphoned away by the 777 Defendants and used for other purposes, including purchasing receivables that Defendants or their affiliates pledged to other lenders.

3.     All of the Defendants were complicit in this fraud, and they conspired to conceal it from ING Capital for more than two years by issuing fraudulent monthly servicing reports and other documents representing that the receivables had been assigned to Sierra 2016, that Sierra 2016 had good title to these assets, and that ING Capital held a first-priority security interest in these assets and their proceeds—all as required under the applicable loan documents.

4.     ING Capital has just in the past year begun learning the details of this longstanding fraudulent scheme.  ING Capital seeks to recover the loan proceeds it advanced in reliance on Defendants' fraudulent misrepresentations, together with any other amounts it may determine it is owed with the benefit of discovery.

## Parties

5.     ING Capital is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business located at 1133 Avenue of the Americas, New York, NY 10036.

6. 777 Partners is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 100 SE 2nd St., Suite 2000, Miami, FL 33131.

7. 600 Partners is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 100 SE 2nd St., Suite 2000, Miami, FL 33131.

8. SuttonPark Capital is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 100 SE 2nd St., Suite 2000, Miami, FL 33131.

9. SuttonPark Servicing is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 100 SE 2nd St., Suite 2000, Miami, FL 33131.

10. Wander is an individual and, on information and belief, a resident of the State of Florida with a permanent address at 1300 Monad Terrace, Penthouse B, Miami Beach, FL 33139. Wander is a co-founder and Managing Partner of 777 Partners and 600 Partners. At all relevant times, Wander was the President of the SuttonPark Defendants. On information and belief, at all relevant times, he and Pasko controlled and managed the SuttonPark Defendants and Sierra 2016.

11. Pasko is an individual and, on information and belief, a resident of the State of Florida with a permanent address at 1451 Brickell Avenue, Penthouse 54, Miami, FL 33131. Pasko is the other co-founder and a Managing Partner of 777 Partners and 600 Partners. At all relevant times, Pasko was the Chief Executive Officer of the SuttonPark Defendants. On information and belief, at all relevant times, he and Wander controlled and managed the SuttonPark Defendants and Sierra 2016.

12.    Love is an individual, and on information and belief, a resident of the State of Florida with a permanent address at 1963 NW 136th Avenue, # 228, Sunrise, FL 33323.  On information and belief, at all relevant times, Love was either an officer or an authorized signatory of each of the SuttonPark Defendants.

### Jurisdiction and Venue

13.    This Court has general subject matter jurisdiction over this matter, and this matter is subject to mandatory assignment to the Complex Business Litigation Section of this Court, because the amount in controversy is at least $28,230,000 (exclusive of interest, costs and attorneys' fees).

14.    The Court has personal jurisdiction over Defendants because (i) each of the Individual Defendants is a resident of the State of Florida and (ii) each of the SuttonPark Defendants and the 777 Defendants maintains its principal place of business in the State of Florida.

15.    Venue is proper in this Court pursuant to Florida Statutes sections 47.011 and 47.021 because one or more of the Defendants resides in Miami-Dade County.

### Statement of the Case

**A.    The Transaction Documents**

16.    ING Capital, the SuttonPark Defendants, and Sierra 2016 (the "Borrower"), a wholly owned subsidiary of SuttonPark Capital, are parties to a lending structure under which ING Capital made loans to fund the acquisition of structured settlement receivables from third parties, which were then supposed to be pledged to ING Capital as collateral.

17.    A structured settlement is a negotiated settlement of a claim that entitles the claimant to periodic payments over a defined time period, typically in settlement of a personal injury or other individual tort claim.  The rights to receive these payments can be bought and sold,

allowing the claimant to exchange some or all of the future payment stream for an immediate lump sum of cash.

18.    On or about June 17, 2016, ING Capital, the Borrower and the SuttonPark Defendants entered into the following agreements:  (i) the Credit Agreement (defined below), under which ING Capital made loans to the Borrower and the Borrower pledged assets to ING Capital; (ii) the Origination Agreement (defined below), under which SuttonPark Capital (the "Originator") was to sell receivables it had acquired from third parties to the Borrower to secure ING Capital's loans; and (iii) the Servicing Agreement (defined below), under which SuttonPark Servicing (the "Servicer") was to administer ING Capital's collateral, including verifying the legitimacy of receivables the Originator proposed to sell to the Borrower, collecting payments on these receivables after the Borrower obtained title to them, and distributing the proceeds to ING Capital.

### i.  The Credit Agreement

19.    In 2016, ING Capital, as Administrative Agent, Sole Lead Arranger and Sole Bookrunning Manager, entered into a Credit Agreement (the "Original Credit Agreement") with the Borrower, the Lenders party thereto from time to time (the "Lenders"), the Originator and the Servicer.

20.    On or about July 12, 2019, ING Capital, the Lenders, the Borrower, the Originator, and the Servicer entered into an Amended and Restated Credit Agreement (as amended, the "Credit Agreement").

21.    The parties to the Credit Agreement subsequently executed eight amendments to the Credit Agreement between March 12, 2020, and July 27, 2022.

22.    ING Capital, in addition to its role as Administrative Agent, Sole Lead Arranger and Sole Bookrunning Manager, is the sole Lender under the Credit Agreement.

23.    Pursuant to the Credit Agreement, ING Capital agreed to make a $50,000,000 credit facility (the "Credit Facility") available to the Borrower to fund the purchase of structured settlement payment rights ("Receivables") that met certain eligibility requirements (as defined in the Credit Agreement, "Eligible Receivables").

24.    As security for the Borrowers' Obligations under the Credit Agreement, pursuant to Section 2.17 of the Credit Agreement, the Borrower granted ING Capital a first-priority security interest in and lien on substantially all assets of the Borrower, including all Receivables that are acquired by the Borrower from time to time (collectively, the "ING Collateral").

25.    To perfect its security interest in the ING Collateral, including new Receivables acquired by the Borrower from time to time, beginning on June 17, 2016, ING Capital caused dozens of UCC-1 financing statements (including amendments and continuations) to be filed with the Delaware Secretary of State against the Borrower and the Originator.

26.    The Credit Agreement provides that a "Default" shall exist to the extent any representation of the Borrower, the Originator or the Servicer under any of the Transaction Documents is untrue or incorrect.  Credit Agreement §§ 1.01 ("Default"), 7.01(c).  After any such representation or warranty has been uncorrected for 30 days, an "Event of Default" is deemed to exist under the Credit Agreement.  *Id.* § 7.01(c).  Other Events of Default include (i) the existence of a "Servicer Default"—defined to include "any failure on the part of the Servicer duly to observe or perform" any of its obligations under the Servicing Agreement, *see* Servicing Agreement § 7.2(a), and (ii) a "Borrowing Base Deficiency"— defined as a condition in which the principal balance due under the Credit Facility exceeds the "Borrowing Base."  Credit Agreement § 7.01(h), (m).

27.     The Borrowing Base is equal, subject to certain adjustments, to 90% of the present value at any such time of all Eligible Receivables securing the Credit Facility.  Credit Agreement § 1.01 ("Borrowing Base").

### ii.    The Origination Agreement

28.     Contemporaneously with execution of the Original Credit Agreement, the Originator and the Borrower entered into an Origination Agreement (the "Origination Agreement"), dated as of June 17, 2016.

29.     Pursuant to the Origination Agreement, the Originator agreed to sell, transfer, assign or otherwise convey to the Borrower all of the Originator's right, title and interest in certain Receivables and all Related Security (each as defined in the Origination Agreement) subject to and in accordance with the terms of the Origination Agreement.

30.     Pursuant to Section 2.05 of the Origination Agreement, ING Capital is named as an express third-party beneficiary with the right to enforce the Origination Agreement as if it were a party thereto.

### iii.    The Servicing Agreement

31.     Contemporaneously with the execution of the Credit Agreement and the Origination Agreement, ING Capital, in its capacity as Administrative Agent, the Borrower, and the Servicer entered into a Servicing Agreement (the "Servicing Agreement," and together with the Credit Agreement, the Origination Agreement, and all other documents or instruments executed connection with the Credit Facility, the "Transaction Documents"), dated as of June 17, 2016.

32.     Pursuant to the Servicing Agreement and a related intercreditor agreement, the Servicer is required to administer the ING Collateral securing the Credit Facility for the benefit of ING Capital.

33.     Together, the Transaction Documents provide a framework for the Originator's acquisition of Receivables from third parties, the Originator's sale of those Receivables to the Borrower, and the Servicer's ongoing administration of the Receivables and their proceeds. As set out below, the Transaction Documents require the Originator and the Servicer to make representations regarding these Receivables to ING Capital both at the time of any acquisition of new Receivables and on a continuing basis thereafter.

**B.      Loans Under the Transaction Documents**

34.     Under the Credit Agreement, the Borrower may request Loans in the aggregate amount equal to the lower of (i) $50,000,000 (the "Commitment"), and (ii) the Borrowing Base calculated in accordance with the Credit Agreement. Credit Agreement §§ 1.01 ("Borrowing Base Limitation"), 3.02(c).

35.     For a Receivable to be considered an "Eligible Receivable," the Borrower must, among other things, (i) have acquired the Receivable from the Originator pursuant to the Origination Agreement, (ii) "ha[ve] good and marketable title" to such Receivable, and (iii) "possess[] all right, title and interest in such Receivable and Related Security, Collections and proceeds thereof, free and clear of any Adverse Claim." Credit Agreement § 1.01.[1]

36.     To request a Loan from ING Capital, the Borrower is required to submit to ING Capital a written Borrowing Request (in the form of Annex F to the Credit Agreement) signed by the Borrower and the Servicer, together with a pro forma Compliance Report (as defined in the Credit Agreement) signed by the Servicer as of the date of the Borrowing Request (in the form of Annex A-1 of the Credit Agreement). Credit Agreement § 2.03, Annex A-1, Annex F.

---

[1] An "Adverse Claim" is defined as "a lien, security interest or other charge or encumbrance, or any other type of preferential arrangement (including any adverse claim referred to in Section 8-102(a)(1) of the UCC)." Credit Agreement § 1.01.

**C.      Representations, Certifications and Warranties of the Borrower, the Servicer and the Originator**

37.      In each Borrowing Request, each of the Borrower (which is owned and controlled by the Originator) and the Servicer certifies, among other things, that no Default or Event of Default (as defined in the Credit Agreement) has occurred and is continuing, that its respective representations and warranties in the Credit Agreement are true and correct, and that each Receivable that forms part of the stated Borrowing Base—both immediately before and after giving effect to the proposed Borrowing—is an Eligible Receivable (meaning, among other things, that the Borrower has good and marketable title to each such Receivable and that no Adverse Claim exists).  Each Borrowing Request provides:

> The Borrower hereby certifies as of the date hereof that, immediately before and after giving effect to the Borrowing described above, (i) each of its representations and warranties in Article IV of the Credit Agreement shall be true and correct, (ii) no Event of Default or Default has occurred and is continuing, (iii) the Borrowing Base Limitation is not exceeded, no Borrowing Base Deficiency exists and each Receivable included in the calculation of the Borrowing Base satisfies the definition of "Eligible Receivable" in the Credit Agreement, (iv) no Reserve Account Deficiency exists and (v) all other applicable requirements of Section 3.02 of the Credit Agreement have been satisfied in all material respects with respect to the Borrowing contemplated hereby.

> The Servicer hereby certifies that (i) each applicable Transfer Order described in Section 3.02(f) of the Credit Agreement has been forwarded to the Back-Up Servicer, together with the related assignment agreement and, if any, the related stipulation (other than with respect to Unacknowledged Receivables) and (ii) as of the date hereof, immediately before and after giving effect to the Borrowing described above, each of its representations and warranties in Article IV of the Credit Agreement shall be true and correct.

Credit Agreement, Annex F.

38.      The pro forma Compliance Report calculates the Borrowing Base after giving effect to the requested Loan and contains a certification from the Servicer that, among other things, (i) all

information in the Compliance Report is true and correct, (ii) no Default or Event of Default exists under the Credit Agreement, and (iii) the Borrower's representations and warranties in Article IV of the Credit Agreement are true and correct.  Credit Agreement § 2.03, Annex A-1.

39.     The representations and warranties contained in Article IV of the Credit Agreement include that:

\* \* \*

(h)     The Borrower is the legal and beneficial owner of the Collateral free and clear of any Adverse Claim . . . . Each Receivable characterized in any Compliance Report or other written statement made by or on behalf of the Borrower as an Eligible Receivable, or as included in the Borrowing Base is, as of the date of such Compliance Report or other statement (or, if applicable, as of a date certain specified in such report), an Eligible Receivable, as properly included in the Borrowing Base;

\* \* \*

(i)     Each Compliance Report . . . , Monthly Report . . . , information, exhibit, financial statement, document, book, record or report furnished or to be furnished at any time by or on behalf of the Borrower to the Administrative Agent or the Lenders in connection with and before or after the Effective Date is or will be accurate in all material respects as of its date or (except as otherwise disclosed to the Administrative Agent or the Lenders, as the case may be, at such time) as of the date so furnished (or, if applicable, as of a date certain specified in such report), and no such document (when taken together with such other documents so furnished) contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein, in the light of the circumstances under which they were made, not misleading; [and]

\* \* \*

(n)     With respect to each Receivable and related Collateral, the Borrower shall have received such Receivable and related Collateral in an amount which constitutes fair consideration and reasonably equivalent value with respect to the purchase price paid by the Borrower.

Credit Agreement § 4.01(h), (i), & (n).

40.     Pursuant to Section 6.08 of the Credit Agreement, the Servicer represents and warrants as of the Effective Date, each Borrowing Date, each Calculation Date, each Distribution Date, each day on which a Disposition (each as defined in the Credit Agreement) occurs and each other date provided under the Credit Agreement or the other Transaction Documents on which such representations and warranties are required or deemed to be made that:

* * *

> (b)     Payment Instructions.  Except for Receivables that constitute Third Party Intercreditor Receivables, it has notified (or has caused the Originator or the Borrower to notify) each Obligor on each Receivable to make payments on such Receivable to either one of the Lock-Boxes or one of the Deposit Accounts or to the Collection Account, as applicable; [and]

> (c)     Compliance Reports and Monthly Reports.     Each Compliance Report, Monthly Report or other pro forma written statement delivered by the Servicer pursuant to this Agreement shall be true and correct in all material respects on the date such report or written statement is delivered.

Credit Agreement § 6.08(b) & (c).

41.     ING Capital is not required to honor a Borrowing Request and extend credit under the Credit Facility unless and until it receives each of the representations identified in paragraphs 37 through 40 above with respect to the requested borrowing.

42.     Contemporaneously with the delivery of the Borrowing Request and the Compliance Report, the Originator, the Borrower and the Servicer are required to prepare and deliver to ING Capital a "Servicing Notice," in the form attached as Exhibit B to the Servicing

Agreement, certifying the *bona fides* of the Receivables to be acquired with the Loan proceeds. Origination Agreement § 2.02(a); Servicing Agreement §§ 1.1 ("Servicing Notice"), 3.2.

43.    Pursuant to Section 4.01(g) of the Origination Agreement, the Originator represents to the Borrower and ING Capital that "[e]ach Receivable identified in any Servicing Notice shall be an Eligible Receivable as of the related Purchase Date." Origination Agreement § 4.01(g). In other words, the Receivable in question must, once purchased by the Borrower, be a Receivable as to which the Borrower acquires "good and marketable title," among other things. Credit Agreement § 1.01 ("Eligible Receivable").

44.    Before delivering the Servicing Notice to ING Capital, in its capacity as Administrative Agent, the Servicer is required to review and approve a "Receivable File" compiled by the Originator for each Receivable being purchased. Origination Agreement § 2.02; Servicing Agreement §§ 3.2, 3.3.

45.    The Receivable File for each Receivable includes the relevant transfer documents pursuant to which the Originator acquired the Receivable, the settlement agreement memorializing the payment terms of the Receivable (i.e., the agreement by which an insurer or other payor agreed to make payments in settlement of a litigation claim), any related Transfer Order[2] and any related judgments, a UCC lien search report against the seller of the Receivable, and other evidence

---

[2] "'Transfer Order' shall mean a written order of a court of competent jurisdiction in any Approved Receivable State evidencing such court's approval of a transfer of some or all of a Receivable Seller's rights under a Contract to the Borrower, the Originator, the applicable Original Purchaser or the applicable Receivable Seller, which transfer has been made in accordance with such state's Transfer Statute, which order is binding with respect to such Receivable Seller (and its successors and assigns), the related Claimant (and its successors and assigns) and each of the Notice Parties, which order is not subject to (or the subject of) appeal, and has not otherwise been vacated or stayed." Origination Agreement § 1.01 (definition of "Transfer Order").

supporting the legitimacy of the Receivable.  Credit Agreement, Annex D ("Receivable File Criteria").

46.    By executing the Servicing Notice, the Servicer certifies to ING Capital that the Servicer "ha[s] received the Receivable File for each Designated Receivable," determined that the "Servicing Eligibility Criteria for each Designated Receivable are satisfied,"[3] and will "administer each Designated Receivable and maintain each related Receivable File in accordance with the terms of the Servicing Agreement."  Servicing Agreement § 3.2, Exhibit B.

47.    If all Servicing Eligibility Criteria are satisfied, the Servicer is required to execute the Servicing Notice and return it to Originator, the Borrower, and ING Capital.  *Id.* § 3.2.

48.    Once the Servicer receives the Receivable File, it is required to hold the Transfer Order and all other documents that make up the Receivable File in trust for the benefit of the Borrower and ING Capital.  *Id.* § 3.3.

49.    Pursuant to Section 6.07 of the Credit Agreement, the Servicer agreed to indemnify ING Capital from and against all claims, losses, or liabilities (including reasonable attorneys' fees) related to or arising out of, among other things:

> (i)    any representation or warranty or statement made or deemed made by the Servicer (or any of its officers) under or in connection with [the Credit] Agreement or Compliance Report which shall have been incorrect in any material respect when made;
>
> * * *
>
> (vi)    any failure of the Servicer to perform its duties or obligations in accordance with the provisions of [the Credit] Agreement and the Servicing Agreement; [or]
>
> * * *

---

[3] The Service Eligibility Criteria require that the Receivable File provided by the Originator be complete and match the list of Receivables included in the Servicing Notice.  Servicing Agreement Ex. A.

(vi)    any breach of an obligation of the Servicer reducing or impairing the rights of the Administrative Agent or the Lenders with respect to any Receivable or the value of any Receivable.

*Id.* § 6.07(i), (iv), & (vi).

### D.    The Servicer's Obligations

50.    Once an Eligible Receivable is transferred to the Borrower, the Servicer is required under the Servicing Agreement to "service, administer and collect amounts owing in respect of the Receivables in each case in such a manner that is in the best interests of and for the benefit of the Borrower, the Administrative Agent and the Lenders, all in accordance with applicable laws, rules and regulations," among other things.  Servicing Agreement §§ 1.1 ("Servicing Standard"), 2.1.

51.    Pursuant to Section 4.1 of the Servicing Agreement, the Servicer is required to prepare and deliver to ING Capital a "Monthly Report" that includes, among other things, a calculation of the Borrowing Base (i.e., the value of the Eligible Receivables securing the Loans), all cash receipts received on account of each Receivable, the payment status of each Receivable, projected future cash receipts for each Receivable, and other financial metrics and data related to each Receivable included in the ING Collateral.  Servicing Agreement § 4.1; Credit Agreement, Annex A-2.

52.    Pursuant to Section 6.02 of the Credit Agreement, the Servicer is required, on behalf of the Borrower, to prepare all calculations required by the Credit Agreement and to deliver Compliance Reports and Monthly Reports on each Calculation Date (each as defined in the Credit Agreement).  Credit Agreement § 6.02(e).

53.    Pursuant to Section 3.1(ix) of the Servicing Agreement, the Servicer is required to notify ING Capital upon the discovery of any "Defective Receivable," which is defined in the Origination Agreement to mean "any Purchased Receivable in respect of which any representation

and warranty made by the Originator . . . is subsequently determined to have been incorrect in any material respect as of the related Purchase Date and such incorrectness has a Material Adverse Effect." Servicing Agreement § 3.1(ix); Origination Agreement § 1.1 ("Defective Receivable").

###### E.    Access to Information

54.    The Credit Agreement and the Servicing Agreement each require the Servicer to provide information to ING Capital related to the Loans and the ING Collateral (including all Receivables) upon request. For example, under Section 4.7 of the Credit Agreement, the Servicer is required to provide information during normal working hours to ING Capital upon five Business Days' written notice. Section 4.7 of the Servicing Agreement provides:

> Section 4.7. Access to Information. Upon giving at least five (5) Business Days' written notice, . . . the Servicer . . . shall give the Borrower, the Administrative Agent and their respective counsel, accountants, and other representatives reasonable access (including, without limitation, on-site access), during normal business hours, to all of its files, books and records (including computer records) relating to the Receivables or the Receivable Files and shall allow the Borrower, the Administrative Agent and their representatives to discuss matters relating to the Receivables or the Services with its officers and employees.

Servicing Agreement § 4.7.

55.    Similarly, Section 5.02 of the Credit Agreement provides that each of the Borrower, the Servicer and the Originator must, at their expense, permit the Administrative Agent and its agents and representatives:

> (i) to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of the Borrower, the Servicer or the Originator, as the case may be, including computer files (and the necessary hardware and software to access such computer files), (ii) to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer files, tapes and disks) in the possession or under the control of the Borrower, the Servicer or the Originator, as the case may be, relating to Receivables and Collateral, including, without limitation, the Receivable Files and Contracts, and (iii) to

> visit the offices and properties of the Borrower, the Servicer or the Originator, as the case may be, for the purpose of examining such materials described in clause (ii) above, and to discuss matters relating to Receivables and the Collateral or the Borrower's, the Servicer's or the Originator's performance under the Transaction Documents or under the Contracts with any of the officers or employees of the Borrower, the Servicer or the Originator, as the case may be, having knowledge of such matters[.]

Credit Agreement § 5.02.

56.    On May 29, 2024, ING Capital delivered a letter to the Servicer demanding that the Servicer turn over all records relating to the Receivables pursuant to section 5.02 of the Credit Agreement, among other things.  To date, the Servicer has not fully complied with this obligation.

### F.    Defendants Fraudulently Induce ING Capital to Advance More than $28.2 Million to the Borrower

57.    As of March 7, 2022, the outstanding principal balance of Loans under the Credit Agreement was $21,770,000, secured by an existing Borrowing Base of Eligible Receivables then valued in accordance with the Transaction Documents at approximately $21.8 million.

58.    On March 7, 2022, the Borrower and the Servicer submitted a Borrowing Request to ING Capital requesting a Loan in the principal amount of $28,230,000 (the "March 2022 Borrowing Request")[4] together with a pro forma Compliance Report (the "March 2022 Compliance Report") and a draft assignment agreement (the "March 2022 Assignment Agreement," and together with the March 2022 Borrowing Request and the March 2022 Compliance Report, the "March 2022 Loan Package") purporting to identify 309 Eligible Receivables to be transferred from the Originator to the Borrower and pledged to ING Capital to

---

[4] $28,230,000 was the maximum amount that could be borrowed at that time under the Credit Agreement, bringing total principal outstanding to $50,000,000.

secure the requested Loan.[5]  As set out below, 273 of these purportedly Eligible Receivables were never transferred to the Borrower (the "Misrepresented Receivables").

59.     The March 2022 Borrowing Request and the March 2022 Compliance Report expressly included or incorporated by reference each of the representations required to be made by the Borrower (as controlled by the Originator), the Originator and the Servicer under the applicable Transaction Documents, including that, both before and after giving effect to the requested borrowing, "each Receivable included in the calculation of the Borrowing Base satisfies the definition of 'Eligible Receivable' in the Credit Agreement" and that the Borrowing Base, after giving effect to the acquisition of the Receivables, would equal $50,017,816.59.

60.     These representations were false when made.  The Originator did not in fact possess the Misrepresented Receivables at the time the Borrowing Request was issued, and it could not (and did not intend to) assign any such Receivables to the Borrower before or after ING Capital funded the requested loan.  In fact, on information and belief, the Misrepresented Receivables did not exist at all; instead, Defendants added these purported "Receivables" to the March 2022 Loan Package knowingly to create the false appearance of genuine Receivables.

61.     Pasko executed the March 2022 Borrowing Request on behalf of both the Borrower and the Servicer and the March 2022 Compliance Report on behalf of the Servicer.

62.     In reliance on the March 2022 Borrowing Request, the March 2022 Compliance Report and the other representations and warranties contained in the March 2022 Loan Package and the Transaction Documents, on March 7, 2022, ING Capital advanced $28,230,000 to the

---

[5] The March 2022 Assignment Agreement was not in the form required by the Transaction Documents, but it nonetheless clearly identified a pool of purportedly Eligible Receivables to be transferred to the Borrower.

Borrower (the "March 2022 Loan Advance," and the proceeds thereof, the "March 2022 Loan Proceeds").

63.     Each of the certifications in the March 2022 Borrowing Request and the March 2022 Compliance Report was false when made because, at the time of the March 2022 Borrowing Request, the Originator did not have title to, and the Borrower never subsequently obtained title to, the Misrepresented Receivables—i.e., the 273 Receivables that were identified in the March 2022 Compliance Report and the associated Servicing Notice but never transferred to the Borrower. Each such misrepresentation also constituted a Default, and, after 30 days, became an Event of Default under Section 7.01(c) of the Credit Agreement.

64.     The March 2022 Loan Proceeds were not used for their intended purpose of purchasing the Misrepresented Receivables to secure the Credit Facility. Instead, the proceeds were transferred to one or both of the 777 Defendants or used to purchase receivables that were pledged to other lenders to Defendants or their affiliates.

65.     As a result, the Credit Facility was left under-secured, and the Borrower was left without the means to repay ING Capital's loans in full.

**G.      The Servicer Submits Fraudulent Monthly Reports Falsely Representing to ING Capital that the Misrepresented Receivables Had Been Assigned to the Borrower and Pledged to ING Capital**

66.     The SuttonPark Defendants, with the assistance of the other Defendants, continued their fraudulent scheme after ING Capital made the March 2022 Loan Advance to hide the absence of the Misrepresented Receivables from the portfolio securing the Credit Facility. Each month, the Servicer prepared and delivered to ING Capital a Monthly Report that materially misrepresented the calculation of the Borrowing Base by including the Misrepresented Receivables in the Borrowing Base, even though the Borrower had never obtained title to them.

67.     In each Monthly Report, the Servicer certified that:

(i) the foregoing information is true and correct as of the dates specified above, (ii) no Default or Event of Default exists under the Amended and Restated Credit Agreement, dated as of Thursday, July 12th, 2019 (as amended, the "Credit Agreement"), by and among Sierra 2016, LLC, ING Capital LLC, as administrative agent and lender, and SuttonPark Capital LLC, as originator and the undersigned, (iii) no Borrowing Base Deficiency or Reserve Account Deficiency exists, the Borrowing Base Limitation is not exceeded and each Receivable included in the calculation of the Borrowing Base satisfies the definition of "Eligible Receivable" in the Credit Agreement, (iv) the representations and warranties in Article IV of the Credit Agreement are true and correct.

68.     Defendant Pasko executed each Monthly Report on behalf of the Servicer.

69.     Each of the certifications contained in each Monthly Report and Compliance Report was knowingly false when made.  Because the Borrower had never acquired the Misrepresented Receivables, (i) the information provided in the Monthly Report was untrue as it indicated that the Misrepresented Receivables had been assigned to the Borrower and comprised a part of the Borrowing Base; (ii) multiple undisclosed Defaults and Events of Default existed under the Credit Agreement; (iii) a Borrowing Base Deficiency existed, and the Receivables included in the calculation of the Borrowing Base were not Eligible Receivables; and (iv) the representations and warranties in Article IV of the Credit Agreement were untrue.

70.     Each of these misrepresentations also constituted a further Default, and, after 30 days, became an Event of Default under Section 7.01(c) of the Credit Agreement.

**H.     The SuttonPark Defendants Reaffirm the Assignment of the Misrepresented Receivables via the 2022 Master Assignment Agreement**

71.     As noted above, the March 2022 Assignment Agreement did not conform to the requirements of the Transaction Documents.  To address this, in July 2022, at ING Capital's request, the SuttonPark Defendants executed a "Master Assignment Agreement" that purported to

confirm and ratify all previous collateral assignments to the Borrower—including the purported assignment of the Misrepresented Receivables (the "2022 Master Assignment Agreement").

72.    In the 2022 Master Assignment Agreement, the Originator represented "that it has previously sold, assigned, transferred, and set over to [the Borrower] all of its right, title and interest in and to the Receivables" set forth on an attached schedule, "in each case, as of the applicable date set forth on" the schedule.

73.    Love executed the 2022 Master Assignment Agreement on behalf of both the Originator and the Borrower in early July 2022.

74.    The schedule to the 2022 Master Assignment Agreement listed each of the 273 Misrepresented Receivables (using the same five-digit numeric codes) that were identified in connection with the March 2022 Borrowing Request and falsely represented that each such Receivable had been assigned to the Borrower as of March 7, 2022.

75.    The representations made in the 2022 Master Assignment Agreement were knowingly false when made because the Misrepresented Receivables were never assigned to the Borrower.  Each such misrepresentation also constituted a Default, and, after 30 days, an Event of Default under Section 7.01(c) of the Credit Agreement.

### I.    Defendants' Purported Efforts to Refinance the Loan and Induce ING Capital's Forbearance

76.    In June 2022, Wander and Pasko approached ING Capital to open a discussion regarding the extension of the Credit Facility beyond its impending July 12, 2022, maturity date (the "Maturity Date").

77.    On or about July 8, 2022—four days before the Maturity Date—representatives of ING Capital participated in a telephone call regarding the Credit Facility with Wander and Pasko. On the call, Wander and Pasko represented that Sierra 2016 would be paying down the Credit

Facility using funds drawn from another structured settlement credit line provided by Leadenhall

Capital Partners ("Leadenhall"), which would require an amendment of that credit line. Pasko and

Wander requested that ING Capital forbear from exercising remedies for two weeks beyond the

Maturity Date to permit the parties to finalize this arrangement. On information and belief, Pasko

and Wander had not in fact discussed this possibility with Leadenhall—and never did

subsequently—despite their statements to ING Capital to this effect.

**J.      ING Capital Agrees to the Eighth Amendment to the Credit Agreement, Extending Maturity to August 30, 2022**

78.     The Credit Facility matured on July 12, 2022, and all Obligations (as defined in the

Credit Agreement) thereunder became due and payable. The Borrower failed to repay all

outstanding Obligations by that date. This was an Event of Default under Section 7.01(b) of the

Credit Agreement.

79.     By letter dated July 12, 2022, ING Capital notified the Borrower that an Event of

Default had occurred and was continuing under the Credit Agreement as a result of the Borrower's

failure to repay all amounts due and owing under the Credit Agreement on or before the Maturity

Date.

80.     On or about July 12, 2022, Pasko called a representative of ING Capital to discuss

extending the Maturity Date of the Credit Facility by six weeks so that Defendants could continue

to explore refinancing options. As part of Defendants' extension proposal, Pasko represented that

the Borrower would repay half of the outstanding Obligations under the Credit Agreement on or

before the three-week mark of the extension.

81.     Approximately two weeks later, on July 27, 2022, in reliance on the representations

by Pasko and Wander that they were working to repay the outstanding Obligations in full, ING

Capital, the Borrower, the Servicer, and the Originator executed the Eighth Amendment to the

Credit Agreement (the "Eighth Amendment"), which extended the Commitment Termination Date (as defined in the Credit Agreement), and by extension the Maturity Date, to August 30, 2022.

82.    In the Eighth Amendment, the Borrower (under the control of the Originator) represented, among other things, that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing." Eighth Amendment § 4. The representations made in the Eighth Amendment were knowingly false when made because, among other things, the representations of the Borrower in the Transaction Documents were untrue and multiple undisclosed Defaults and Events of Default had occurred and were continuing as a result of, among other things, the SuttonPark Defendants' failure to acquire the Misrepresented Receivables and assign them to the Borrower.

83.    Pasko executed the Eighth Amendment on behalf of the Borrower, the Servicer and the Originator.

84.    The Borrower again failed to pay its outstanding obligations under the Credit Agreement on or before the extended August 30, 2022, Maturity Date. This was an Event of Default under Section 7.01(b) of the Credit Agreement.

85.    By letter dated August 31, 2022, Plaintiff notified the Borrower that an Event of Default had occurred and was continuing as a result of the Borrower's failure to repay all amounts due and owing under the Credit Agreement on before the extended Maturity Date.

**K.    Defendants Continue to Conceal their Fraud and Make False Assurances Regarding the Repayment of the Credit Facility in the Fall of 2022**

86.    On or about September 2, 2022, Wander participated in a telephone call with Jonathan Banks, then a Managing Director at ING Capital, and informed Banks that the Borrower

would make a $3,000,000 payment under the Credit Facility while the parties worked on another extension agreement and Defendants continued to try and identify a refinancing solution.

87.     By email dated September 7, 2022, Banks contacted Love because ING Capital had not received the promised $3,000,000 payment.  Banks informed Love that, to obtain ING Capital's agreement to any further extension of the Credit Facility, the Borrower would need to repay all outstanding Obligations under the Credit Agreement within the relevant extension period.

88.     In early October 2022, Wander and Pasko proposed a further extension of the Maturity Date and a partial repayment of the Credit Facility in exchange for the release of certain Receivables.

89.     On October 4, 2022, Pasko emailed representatives of ING Capital, seeking to finalize an extension so that "we can start moving assets off the ING line."

90.     On October 10, 2022, and again on October 14, 2022, Wander, Pasko and Love participated in telephone calls with representatives of ING Capital during which Wander and Pasko further discussed the proposal.

91.     According to Wander and Pasko, the refinancing plan would be carried out in two steps.  First, the Borrower would make a partial repayment of the outstanding Obligations and ING Capital would release certain Receivables from its Collateral on a dollar-for-dollar basis.  Wander claimed in these discussions that Defendants would use cash from a separate aviation financing transaction with the Boeing Company to fund this initial paydown.  Second, Wander claimed the Borrower would sell the released Receivables (which included many of the Misrepresented Receivables, as set out below) and use the cash proceeds to repay the remaining outstanding Obligations due under the Credit Agreement.  Wander and Pasko committed that the first step would occur on or before November 4, 2022, and that the sale of the released Receivables

(including the Misrepresented Receivables) and the final payment of all outstanding Obligations would occur on or before November 30, 2022.

92.    On October 19, 2022, at the request of ING Capital, a representative of the SuttonPark Defendants who reported to Wander and Pasko emailed ING Capital representatives, copying Wander and Pasko, a schedule of the Receivables that would purportedly be released and sold as part of the proposed transaction (the "Release Schedule").  The Release Schedule included approximately 160 of the 273 Misrepresented Receivables.  Wander and Pasko knew that these Misrepresented Receivables were incapable of being sold—as the Borrower did not in fact own them—and therefore that the proposed transaction was incapable of being effectuated.

93.    A few hours later, Wander separately emailed representatives of ING Capital personally apologizing for the delay in providing the Release Schedule.

94.    On November 7, 2022, the Borrower, the Servicer, and the Originator executed and delivered a side letter agreement (the "Side Letter") to ING Capital specifying that (i) the Borrower would make a partial repayment of the Loan and other Obligations under the Credit Agreement in an amount not less than $26,670,174, and (ii) in exchange, ING Capital would release the Receivables listed on the Release Schedule from its Collateral.

95.    Pasko executed the Side Letter on behalf of the Borrower, the Servicer, and the Originator.

96.    ING Capital did not execute the Side Letter or release the Collateral because the Borrower never made the $26,670,174 partial repayment specified in the Side Letter.

97.    By email dated November 14, 2022, Wander informed representatives of ING Capital that Defendants' ability to access cash via the Boeing deal had been delayed and that the SuttonPark Defendants were unable to fund the proposed paydown to ING Capital.

98.     By email dated November 29, 2022, Wander again told ING Capital that the Boeing transaction had been delayed.  Wander, however, assured ING Capital that, despite the delays, "one plane will sell early next week (mon-wed) which create [*sic*] the necessary cash for half the paydown" and he was "100% confident all of these deliveries will take place."

99.     The Borrower did not make the $26,670,174 partial repayment the following week, as Wander had promised, or at any time after that.

100.     On December 6, 2022, a SuttonPark representative who reported to Wander and Pasko emailed representatives of ING Capital, copying Wander and Pasko, to report additional delays in the Boeing financing.  He cited "a multitude of factors, many outside of our control," for the delay, and assured ING Capital that "we're confident these transactions will be fulfilled well before year-end."  He also reported that "we have been in discussions with other aviation focused firms on selling aircraft . . . which may provide necessary liquidity needed to fully refinance the Sierra collateral prior to Boeing[.]"  The email concluded: "We appreciate your continued patience with us as we work through all of our options towards getting the Sierra facility paid off as quickly as possible."

101.     On information and belief, all of the statements made by the SuttonPark representative identified in paragraphs 92 through 100 above were made at the direction of Wander and Pasko.

**L.     The December 2022 Forbearance Agreement**

102.     On December 12, 2022, Wander and Pasko participated in another telephone call with ING Capital regarding the continued delays and their purported efforts to refinance or otherwise pay down the Credit Facility.

103.     As a result of this discussion and the prior written assurances ING Capital had been given, on December 15, 2022, at Defendants' request, ING Capital, the Borrower, and the

SuttonPark Defendants entered into a Forbearance Agreement (the "Forbearance Agreement"), back-dated as of August 30, 2022 (the amended Maturity Date).

104. Pursuant to the Forbearance Agreement, Plaintiff agreed temporarily to forbear from exercising its rights and remedies under the Credit Agreement until the earlier of January 31, 2023, and the occurrence of a Forbearance Termination Event (as defined in the Forbearance Agreement).

105. Pursuant to Section 13 of the Forbearance Agreement, the Borrower ratified and affirmed that (i) all Receivables set forth on Schedule 1 to the Forbearance Agreement, which included the Misrepresented Receivables, had previously been assigned to the Borrower, and (ii) all Receivables set forth on Schedule 1 constituted Eligible Receivables under the Credit Agreement.

106. Pasko executed the Forbearance Agreement on behalf of the Borrower, the Servicer, and the Originator.

107. The ratifications contained in Section 13 of the Forbearance Agreement were knowingly false because the Misrepresented Receivables had never been assigned to the Borrower, and therefore they were not Eligible Receivables.

108. After the Forbearance Agreement was signed, Wander continued to apologize for the delay in paying down the outstanding Obligations under the Credit Agreement without offering any solutions grounded in reality. By email dated January 9, 2023, Wander claimed that third parties involved in the proposed Boeing transaction were still causing delays. Nonetheless, Wander assured ING Capital that "we are being completely up front with you about the entire process" and that "we will be paying down a meaningful portion of the loan by the end of this week."

109.    Defendants did not pay down any of the Loan—much less a meaningful portion—by the end of that week.

110.    The Borrower again failed to repay the amounts due under the Credit Agreement and the Forbearance Agreement on or before January 31, 2023, as required by Section 6(a) of the Forbearance Agreement.

111.    By letter dated February 6, 2023, ING Capital informed the Borrower that a Forbearance Termination Event had occurred under section 1(a) of the Forbearance Agreement as a result of the Borrower's failure to repay all Obligations and that, accordingly, the "Forbearance Period" under the Forbearance Agreement had terminated.

**M.    Defendants Continue Concealing their Fraud in 2023**

112.    In late January 2023, ING Capital identified a concerning growth in the number of reported uncollected Receivables in the Monthly Report delivered by the Servicer for December 2022.  The December 2022 Monthly Report showed outstanding uncollected Receivables of approximately $1,821,159.71.

113.    By email dated January 31, 2023, an ING Capital representative emailed a SuttonPark representative who reported to Wander and Pasko asking why the volume of uncollected Receivables had grown so high, observing that "[t]hese are presumably receipts from highly rated insurers which should normally be collected within 60 days at most?"

114.    The SuttonPark representative responded on February 1, 2023, adding Wander, Pasko, and Love to the thread, claiming that he would look into it.  On February 2, the SuttonPark representative responded, again copying Wander, Pasko, and Love, that the problem had arisen from "an address change implemented by Wells Fargo across their lockboxes," meaning the accounts the Servicer maintained at Wells Fargo that collected payments on the Receivables from insurers, and reported Defendants were working to resolve the problem and that "we expect this

issue to subside in the coming months." On information and belief, this explanation was not true, or not completely true. The delinquencies were at least partially attributable to the absence of the Misrepresented Receivables in ING Capital's collateral package and the SuttonPark Defendants' liquidity problems, which prevented them from covering the payments purportedly due on the Misrepresented Receivables and effectively concealing their fraud.

115.    On February 17, 2023, an ING Capital representative again followed up by email, noting that the uncollected Receivables balance had jumped even higher—to $2,292,941.53—in the January 2023 Monthly Report. The ING Capital representative also noted he was "puzzled that the balance of the collections account [at Wells Fargo] is unchanged since Nov 2022 despite getting cash receipts." The collections account in question was maintained by the Servicer, and was the primary account into which receivables were deposited by insurers before the cash was distributed to ING Capital, securitization trustees, and other lenders. While ING Capital did not realize this at the time, the lack of activity in the collections account signified that payments were not being received on account of the Misrepresented Receivables, even though the Monthly Reports indicated many payments on these Receivables were being made. In other words, Defendants had allowed an inconsistency to appear in their fraudulent bookkeeping and reporting.

116.    Defendants did not respond in substance to these questions, but, a few days later, on February 22, 2023, a SuttonPark representative who reported to Wander and Pasko again reached out by email to propose a refinancing of the Credit Facility.

117.    On February 27, 2023, Wander, Pasko, and other SuttonPark representatives participated in a telephone call with ING Capital representatives to discuss another proposal to refinance the Credit Facility. On the call, Pasko stated that the Borrower would resume payments on the Credit Facility by the beginning of the following week. Pasko instructed ING Capital to

coordinate with a SuttonPark representative who reported to Wander and Pasko regarding this payment.

118. ING Capital then attempted to coordinate with the SuttonPark representative, as instructed. However, the representative ignored all communications from ING Capital and the Borrower failed to make any payments to ING Capital.

119. On March 5, 2023, an ING Capital representative emailed Wander, Pasko, Love, and other representatives of SuttonPark expressing frustration that "the senior management team at Sierra / 777 Partners refuse to respond to requests for meetings / information." A SuttonPark representative who reported to Wander and Pasko responded on March 6, 2023, claiming he had been traveling and "needed input"—meaning input from Wander and Pasko—"on the proposed collateral release" associated with the latest repayment proposal. An ING Capital representative followed up again by email on March 8 and March 9, 2023, but the SuttonPark representative who reported to Wander and Pasko only responded that "[w]e will be getting back to you shortly" and that Defendants "understand the importance/urgency[.]"

120. On information and belief, all of the statements made by the SuttonPark representative identified in paragraphs 114 through 119 above were made at the direction of Wander and Pasko.

121. On March 14, 2023, an ING Capital representative spoke to Pasko by telephone to inquire again about the unpaid Receivables identified on the Monthly Reports. Pasko instructed the ING Capital representative to contact Love to resolve the issue, which the ING Capital representative did that same day. Love responded by disclaiming knowledge of the Receivables at issue and requesting details from ING Capital.

122.    Love participated in telephone calls with ING Capital representatives on March 16, 2023, and April 6, 2023, to discuss this issue.  Pasko also participated in a telephone call with Love and ING Capital representatives on April 18, 2023, and continued to offer empty assurances.  However, Defendants ultimately failed to resolve the issue, and the Receivables remained unpaid.

123.    Despite Defendants' continued assurances, the Credit Facility has remained continually in default since the Forbearance Agreement terminated on January 31, 2023.

**N.    Wander's and Pasko's Knowledge of and Participation in the Ongoing Fraud**

124.    From July 2022 through November 2023, ING Capital acted in reliance on direct communications and representations from Wander and Pasko in deciding to extend the Maturity Date of the Credit Facility and to delay enforcement of its rights and remedies under the Credit Agreement.

125.    From July 2022 through June 2023, Wander participated personally in discussions with ING Capital representatives related to the defaults and collateral shortfalls under the Credit Facility on numerous occasions.  ING Capital's records show that, in addition to the unscheduled telephone calls and email exchanges in which Wander participated, Wander accepted formal meeting invitations from ING Capital or was included as a required participant in meeting invitations issued by SuttonPark representatives for each of the following dates, at a minimum: July 8, 2022; September 2, 2022; September 23, 2022; September 30, 2022; November 3, 2022; December 12, 2022; January 3, 2023; February 27, 2023; and June 29, 2023.

126.    Between July 2022 and November 2023, Pasko participated personally in discussions with ING Capital representatives related to the defaults and collateral shortfalls under the Credit Facility on numerous occasions.  ING Capital's records show that, in addition to the unscheduled telephone calls and email exchanges in which Pasko participated, Pasko accepted

formal meeting invitations from ING Capital or was included as a required participant in meeting invitations issued by SuttonPark representatives for each of the following dates, at a minimum: July 5, 2022; July 8, 2022; July 12, 2022; July 27, 2022; September 6, 2022; September 23, 2022; September 30, 2022; October 10, 2022; October 14, 2022; October 21, 2022; October 25, 2022; November 3, 2022; November 18, 2022; December 12, 2022; December 19, 2022; January 3, 2023; February 27, 2023; April 6, 2023; May 26, 2023; June 21, 2023; June 29, 2023; August 24, 2023; September 6, 2023; and November 21, 2023.

127.    Both Wander and Pasko were aware that, by continuing to oversee the issuance of fraudulent Monthly Reports showing the Misrepresented Receivables, by giving persistent (false) assurances that the Credit Facility would be refinanced or paid off, by attempting to induce ING Capital to forbear from exercising remedies under the Credit Facility, and by concealing the misuse of the March 2022 Loan Proceeds, they were perpetuating the fraudulent scheme that they had orchestrated.  On information and belief, Wander and Pasko knew that the March 2022 Loan Proceeds had been misused, and that the Misrepresented Receivables did not exist, while engaging actively with ING Capital regarding the loan for more than two years after the March 2022 Loan Advance.

128.    In the alternative, even if Wander and Pasko did not know these facts, they had every reason to investigate the matter, and accordingly should have known them.  Wander and Pasko each received dozens of emails from ING Capital representatives raising substantial and urgent questions regarding the Borrower's non-performance under the Credit Facility, which was especially unusual given that it was secured by court-sanctioned payment obligations of name brand insurers.

129. While Wander and Pasko often relied on a subordinate to field ING Capital's inquiries, that subordinate made clear that he lacked authority to make any decisions regarding the Loan, or any assurances on Defendants' behalf, without the approval of Wander and Pasko.

**O.    ING Capital's Investigation Regarding the Misrepresented Receivables**

130. In or around February 2024, Love participated in a call with Banks in which Love informed Banks that the Misrepresented Receivables were never acquired by the Originator or transferred to the Borrower.

131. On the call, Love told Banks that the decision to not acquire and transfer the Misrepresented Receivables all came from the "head office."

132. Based on prior conversations with Defendants, Banks and ING Capital understood that "head office" referred to each of Wander, Pasko, and 777 Partners.

133. On May 3, 2024, Leadenhall and an affiliated entity (together, the "Leadenhall Plaintiffs") commenced a lawsuit against Wander, Pasko, the 777 Defendants, the SuttonPark Defendants and others (collectively, the "Leadenhall Defendants"), alleging that the Leadenhall Defendants had (i) "double pledged" $185 million in collateral intended to secure loans the Leadenhall Plaintiffs had made to certain of the Leadenhall Defendants that were guaranteed by the 777 Defendants and (ii) defrauded the Leadenhall Plaintiffs out of hundreds of millions of dollars used to, among other things, acquire interests in European football clubs. *See Leadenhall Capital Partners LLP,* et al. *v. Wander,* et al., No. 1:24-cv-03453 (S.D.N.Y.), ECF No. 182 (the "*Leadenhall* Action").  After the *Leadenhall* Action was commenced, ING Capital and its advisors began investigating the status of the ING Collateral.  On information and belief, including the information obtained in the foregoing investigation:

> (a)    The Misrepresented Receivables were never acquired by the Originator or transferred to the Borrower.

(b)    No Receivable Files for the 273 Misrepresented Receivables exist.

(c)    Wander and Love have admitted to third parties that they were aware at the time of the March 2022 Loan Advance that the proceeds would not be, and were not, used by the Borrower to acquire the Misrepresented Receivables.

(d)    On March 7, 2022—the same day the March 2022 Loan Advance was made to the Borrower—the full $28.2 million of the March 2022 Loan Proceeds were transferred to SuttonPark Capital.

(e)    On March 7, 2022, SuttonPark Capital transferred approximately $20.1 million to a third-party aggregator of structured settlement receivables.  These funds were used to purchase receivables that were then pledged as collateral to lenders other than ING Capital.

(f)    The following day, March 8, 2022, SuttonPark Capital transferred $4.38 million to 777 Partners.

(g)    Eleven Receivables that *were* validly assigned to the Borrower as of March 7, 2022 (i.e., Receivables that were *not* included in the Misrepresented Receivables) have been used by the SuttonPark Defendants to pay another lender (the "Misdirected Receivables").

## P.    Defendants' Fraudulent Misrepresentations

134.    ING Capital relied on each of the following misrepresentations, among others, in making the March 2022 Loan Advance and in forbearing from exercising remedies or taking other action to recover the March 2022 Loan Proceeds for more than two years thereafter:

(a)    The representations made by the Borrower (under the control of the Originator), the Servicer and Pasko (as signatory on behalf of the Borrower and the Servicer) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base Deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by the Servicer and Pasko (as signatory on behalf of the Servicer) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)     The representation made by the Originator under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to the Servicer shall be an Eligible Receivable.

(d)     The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)     The representations made by the Originator and Love (as signatory on behalf of the Originator) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)     The representations made by the Borrower (under the control of the Originator), the Originator, the Servicer and Pasko (as signatory on behalf of the Borrower, the Originator and the Servicer) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement.  Forbearance Agreement § 13, Schedule 1.

(g)     The continuing representations made by the Servicer and Pasko (as signatory on behalf of the Servicer) in each of the Monthly Reports the Servicer delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

(h)     The continuing representations made by Wander and Pasko after the March 2022 Loan Advance that they were committed to finding solutions to the persistent delinquencies under the Credit Facility—including by selling the nonexistent Misrepresented Receivables—while concealing the true status of the Misrepresented Receivables and the misuse of the March 2022 Loan Proceeds.

## Q.     ING Capital's Damages

135.    ING Capital suffered damages, in an amount to be determined at trial, as a result of both (1) the fraudulent March 2022 Loan Advance and (2) ING Capital's agreement to extend the

Maturity Date and to forbear from exercising its rights and remedies as a result of Defendants' ongoing misrepresentations and active concealment of their fraudulent scheme, which continued for more than two years after the March 2022 Loan Advance.

136. Defendants continued to perpetuate their fraud against ING Capital while, on information and belief, also defrauding other lenders whose facilities were administered by the SuttonPark Defendants, as alleged in the *Leadenhall* Action and elsewhere. This persistent course of conduct increased the SuttonPark Defendants' liabilities, which ultimately rendered the SuttonPark Defendants insolvent and incapable of fulfilling their obligations under the Transaction Documents.

137. Had Defendants not actively concealed their fraud after the March 2022 Loan Advance, the fraud would quickly have become apparent to ING Capital. This could have enabled ING Capital to take action to recover its assets at a time when the SuttonPark Defendants were solvent, allowing ING Capital to recover its losses from them directly.

138. In addition, because the SuttonPark Defendants' liabilities rendered them incapable of administering the Loan and the Collateral as contemplated by the Transaction Documents, ING Capital (and the other lenders) were forced to engage a replacement servicer to administer the Collateral that remains with the Borrower and secures the outstanding obligations under the Credit Facility. The process of negotiating the replacement servicer arrangement and overseeing the migration of the Collateral away from the SuttonPark system—along with the additional costs payable to the replacement servicer beyond what was contemplated by the Servicing Agreement or the other Transaction Documents—has cost and will cost ING Capital hundreds of thousands of dollars in the aggregate.

139.    ING Capital's damages also include (1) legal fees it expended negotiating the Eighth Amendment, the Forbearance Agreement, and the other transactions Defendants proposed in an effort to conceal their fraud after the March 2022 Loan Advance, which Defendants knew they were incapable of performing, (2) the legal and other professional costs ING Capital has incurred investigating and pursuing action since it discovered Defendants' fraud, and (3) the opportunity costs arising from other investment opportunities ING Capital was unable to participate in while the Credit Facility remained (and remains) unpaid

## COUNT I
### (Breach of the Credit Agreement Against SuttonPark Servicing)

140.    ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

141.    The Credit Agreement is a valid and enforceable agreement.

142.    ING Capital fully performed its obligations under the Credit Agreement.

143.    All conditions precedent to enforcement of the Credit Agreement have been satisfied or waived.

144.    By executing and delivering the false March 2022 Borrowing Request, the March 2022 Compliance Report, and each Monthly Report thereafter, SuttonPark Servicing breached Sections 6.02 and 6.08 of the Credit Agreement.

145.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Servicing for breach of the Credit Agreement in an amount to be determined at trial.

## COUNT II
### (Breach of the Servicing Agreement Against SuttonPark Servicing)

146.    ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

147.    The Servicing Agreement is a valid and enforceable agreement.

148.    ING Capital fully performed its obligations under the Servicing Agreement.

149.    All conditions precedent to enforcement of the Servicing Agreement have been satisfied or waived.

150.    By making fraudulent misrepresentations regarding the Receivables to ING Capital and misusing the March 2022 Loan Proceeds to pay the 777 Defendants and purchase receivables that were pledged to other lenders, and by paying the proceeds of the Misdirected Receivables to other lenders, SuttonPark Servicing breached Section 2.1 of the Servicing Agreement, which requires SuttonPark Servicing, among other things, "to service, administer and collect amounts owing in respect of the Receivables in each case in such a manner that is in the best interests of and for the benefit of the Borrower, the Administrative Agent and the Lenders, all in accordance with applicable laws, rules and regulations[.]"

151.    SuttonPark Servicing breached Section 3.1(ix) of the Servicing Agreement by failing to notify ING Capital of the existence of Defective Receivables from and after March 2022.

152.    SuttonPark Servicing breached Section 3.2 of the Servicing Agreement by failing to verify the legitimacy of purportedly Eligible Receivables to be acquired by the Borrower and by delivering the March 2022 Borrowing Request and the March 2022 Compliance Report which contained knowingly false certifications and representations.

153.    SuttonPark Servicing breached Section 4.1 of the Servicing Agreement by executing and delivering false Monthly Reports from March 2022 to the present.

154.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Servicing for compensatory damages in an amount to be determined at trial.

## COUNT III
### (Indemnification Under the Credit Agreement Against SuttonPark Servicing)

155.    ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

156.    Pursuant to Section 6.07 of the Credit Agreement, SuttonPark Servicing agreed to indemnify ING Capital, in its capacity as Administrative Agent and Lender, from and against all claims, losses, or liabilities (including reasonable attorneys' fees) related to or arising out of, among other things:

(a)    any representation or warranty or statement made or deemed made by SuttonPark Servicing (or any of its officers) under or in connection with the Credit Agreement or Compliance Report which shall have been incorrect in any material respect when made;

(b)    any failure of SuttonPark Servicing to perform its duties or obligations in accordance with the provisions of the Credit Agreement and the Servicing Agreement; and

(c)    any breach of an obligation of SuttonPark Servicing reducing or impairing the rights of the Administrative Agent or the Lenders with respect to any Receivable or the value of any Receivable.

157.    ING Capital has suffered losses as a result of SuttonPark Servicing's false representations and warranties contained in the Servicing Agreement and each Compliance Report and its failure to perform its obligations under the Credit Agreement and the Servicing Agreement.

158.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Servicing for all losses suffered as a result of SuttonPark Servicing's false representations and other breaches of the Servicing Agreement and the other Transaction Documents in an amount to be determined at trial.

-38-

## COUNT IV
### (Breach of the Origination Agreement Against SuttonPark Capital)

159.    ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

160.    The Origination Agreement is a valid and enforceable agreement.

161.    Pursuant to Section 2.05 of the Origination Agreement, ING Capital is an express third-party beneficiary of the Origination Agreement, entitled to the enforce the terms of the Origination Agreement as if it were a party thereto.

162.    All conditions precedent to enforcement of the Origination Agreement have been satisfied or waived.

163.    On or about March 7, 2022, ING Capital made the March 2022 Loan Advance to the Borrower in the amount of $28,230,000, which was supposed to be used to purchase the Misrepresented Receivables.

164.    On information and belief, in connection with the March 2022 Loan Advance, SuttonPark Capital, as Originator, delivered to the Borrower a Servicing Notice that falsely certified those matters specified in Section 3.01 of the Origination Agreement.

165.    On information and belief, after receiving the March 2022 Loan Advance from ING Capital, the Borrower remitted the purchase price to SuttonPark Capital for the Misrepresented Receivables.

166.    SuttonPark Capital never acquired title to the Misrepresented Receivables and never assigned or transferred title to the Misrepresented Receivables to the Borrower, in breach of the Origination Agreement.

167.    By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Capital for compensatory damages in an amount to be determined at trial.

## COUNT V
### (Fraud Against all Defendants)

168.    ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

169.    The 777 Defendants and Wander conspired and entered into an agreement with the SuttonPark Defendants, the Borrower (under the control of the Originator), Love and Pasko to defraud ING Capital and to fraudulently induce ING Capital to make the March 2022 Loan Advance and forbear thereafter from exercising remedies or taking other action to recover the March 2022 Loan Proceeds.

170.    The SuttonPark Defendants, the Borrower (under the control of the Originator), Love, Wander, and Pasko made material false written and oral representations to ING Capital certifying the legitimacy and disposition of the Misrepresented Receivables and the Misdirected Receivables in connection with the March 2022 Borrowing request and thereafter, including:

(a)    The representations made by the Borrower (under the control of the SuttonPark Capital), SuttonPark Servicing and Pasko (as signatory on behalf of the Borrower and SuttonPark Servicing) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)     The representation made by SuttonPark Capital under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to SuttonPark Servicing shall be an Eligible Receivable.

(d)     The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)     The representations made by SuttonPark Capital and Love (as signatory on behalf of SuttonPark Capital) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)     The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Capital, SuttonPark Servicing and Pasko (as signatory on behalf of each of the foregoing entities) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement.  Forbearance Agreement § 13, Schedule 1.

(g)     The continuing representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in each of the Monthly Reports that SuttonPark Servicing delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

(h)     The continuing representations made by Wander and Pasko after the March 2022 Loan Advance that they were committed to finding solutions to the persistent delinquencies under the Credit Facility—including by selling the nonexistent Misrepresented Receivables—while concealing the true status of the Misrepresented Receivables and the misuse of the March 2022 Loan Proceeds.

171.    Each of the Defendants knew that these representations (i) were false when they were made and (ii) would be relied upon by ING Capital in making the March 2022 Loan Advance

to the Borrower and/or forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds thereafter.

172. Each of the SuttonPark Defendants, Love and Pasko made (or caused the Borrower to make) the foregoing misrepresentations with the intent to induce ING Capital's reliance.

173. Each of the foregoing misrepresentations was with the knowledge of 777 Partners, 600 Partners, and Wander.

174. Each of the foregoing misrepresentations was made at Wander's direction.

175. Representatives of the 777 Defendants, including Wander and Pasko, continued to interact with ING Capital after March 2022 to induce ING Capital's forbearance from exercising remedies under the Transaction Documents or taking other action, while knowingly concealing the existence of the frauds described herein.

176. ING Capital reasonably relied on the misrepresentations of the SuttonPark Defendants, the Borrower (under the control of the Originator), and Pasko in making the March 2022 Loan Advance.

177. ING Capital reasonably relied on the misrepresentations of the SuttonPark Defendants, the Borrower (under the control of the Originator), Wander, Pasko, and Love after the March 2022 Loan Advance in forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds.

178. By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against all Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial.

## COUNT VI
### (Aiding and Abetting Fraud Against the
### Individual Defendants and the 777 Defendants)

179.    ING Capital repeats and realleges paragraphs 1 through 139 and 168 through 178 with the same force and effect as if set out in full.

180.    The SuttonPark Defendants and the Borrower (under the control of the Originator) made material false written representations to ING Capital certifying the legitimacy and disposition of the Misrepresented Receivables and the Misdirected Receivables in connection with the March 2022 Borrowing request and thereafter, including:

(a)    The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Servicing and Pasko (as signatory on behalf of the Borrower and SuttonPark Servicing) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)    The representation made by SuttonPark Capital under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to SuttonPark Servicing shall be an Eligible Receivable.

(d)    The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)    The representations made by SuttonPark Capital and Love (as signatory on behalf of SuttonPark Capital) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related

-43-

Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)    The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Capital, SuttonPark Servicing and Pasko (as signatory on behalf of each of the foregoing entities) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement.  Forbearance Agreement § 13, Schedule 1.

(g)    The continuing representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in each of the Monthly Reports that SuttonPark Servicing delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

181.    Each of the SuttonPark Defendants knew that these representations (i) were false when they were made and (ii) would be relied upon by ING Capital in making the March 2022 Loan Advance to the Borrower and/or forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds thereafter.

182.    Each of the SuttonPark Defendants (or caused the Borrower to make) the foregoing misrepresentations with the intent to induce ING Capital's reliance.

183.    ING Capital reasonably relied on the misrepresentations of the SuttonPark Defendants and the Borrower (under the control of SuttonPark Capital) in making the March 2022 Loan Advance.

184.    ING Capital reasonably relied on the misrepresentations of the SuttonPark Defendants and the Borrower (under the control of the Originator) after the March 2022 Loan Advance in forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds.

185. Each of the foregoing misrepresentations was made with the knowledge of the 777 Defendants and the Individual Defendants.

186. Each of the foregoing misrepresentations was made at the direction of the Individual Defendants.

187. The 777 Defendants and the Individual Defendants each provided substantial assistance to the SuttonPark Defendants by, among other things, preparing, approving, and executing documents containing the foregoing misrepresentations, and helping to conceal the fraud on an ongoing basis after the March 2022 Loan Advance.

188. By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against the Individual Defendants and the 777 Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial.

## COUNT VII
**(Negligent Misrepresentation Against All Defendants)**

189. ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

190. The SuttonPark Defendants, the Borrower (under the control of the Originator), Love, Wander, and Pasko made material false written and oral representations to ING Capital certifying the legitimacy and disposition of the Misrepresented Receivables and the Misdirected Receivables in connection with the March 2022 Borrowing request and thereafter, including:

(a) The representations made by the Borrower (under the control of the SuttonPark Capital), SuttonPark Servicing and Pasko (as signatory on behalf of the Borrower and SuttonPark Servicing) in the March 2022 Borrowing Request that, after giving effect to the requested Loan, among other things, (i) no Borrowing Base deficiency would exist and each Receivable included in the calculation of the Borrowing Base would satisfy the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower would acquire good and marketable title to, and would possess all right, title and interest in, those Receivables), (ii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct, and (iii) each of the requirements of Section 3.02 of the Credit Agreement was met.

(b)    The representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in the March 2022 Compliance Report that (i) the stated Borrowing Base setting out the value of the Misrepresented Receivables was true and correct, (ii) no Default or Event of Default existed under the Credit Agreement, and (iii) reiterating the other representations contained in the Borrowing Request.

(c)    The representation made by SuttonPark Capital under Section 4.01(g) of the Origination Agreement that each of the Receivables identified in the Servicing Notice delivered to SuttonPark Servicing shall be an Eligible Receivable.

(d)    The representations made by the Borrower (under the control of the Originator) and Pasko in Section 4 of the Eighth Amendment that "all representations and warranties of the Borrower set forth in the Credit Agreement and in any other Transaction Document are true and correct in all material respects" and that "no Default or Event of Default has occurred and is continuing."

(e)    The representations made by SuttonPark Capital and Love (as signatory on behalf of SuttonPark Capital) in the 2022 Master Assignment Agreement that the 273 purported Receivables comprising the Misrepresented Receivables and "all Related Security related to such Receivable[s]" had been "sold, assigned, transferred and set over to" the Borrower on March 7, 2022.

(f)    The representations made by the Borrower (under the control of SuttonPark Capital), SuttonPark Capital, SuttonPark Servicing and Pasko (as signatory on behalf of each of the foregoing entities) in the Forbearance Agreement that the Receivables purportedly included the Misrepresented Receivables were the subject of valid security interests in favor of ING Capital and constituted Eligible Receivables under the Credit Agreement.  Forbearance Agreement § 13, Schedule 1.

(g)    The continuing representations made by SuttonPark Servicing and Pasko (as signatory on behalf of SuttonPark Servicing) in each of the Monthly Reports that SuttonPark Servicing delivered to ING Capital from April 2022 through and including August 2024 that (i) the stated monthly Borrowing Base calculations, which purported to include the value of the Misrepresented Receivables and the Misdirected Receivables, were true and correct; (ii) no Borrowing Base deficiency existed and each Receivable included in the calculation of the Borrowing Base satisfied the definition of "Eligible Receivable" in the Credit Agreement (i.e., that the Borrower possessed all right, title and interest in, those Receivables); (iii) each of the representations and warranties in Article IV of the Credit Agreement was true and correct; and (iv) each of the requirements of Section 3.02 of the Credit Agreement was met.

(h)    The continuing representations made by Wander and Pasko after the March 2022 Loan Advance that they were committed to finding solutions to the persistent delinquencies under the Credit Facility—including by selling the nonexistent Misrepresented Receivables—while concealing the true status of the Misrepresented Receivables and the misuse of the March 2022 Loan Proceeds.

-46-

191. Defendants made these representations without knowledge of the truth or falsity of such representations or in circumstances under which they ought to have known of the falsity of such representations.

192. By making these representations Defendants intended to induce ING Capital to make the March 2022 Loan Advance or to forbear from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds.

193. ING Capital reasonably relied on the representations of the SuttonPark Defendants, the Borrower (under the control of the Originator), and Pasko in making the March 2022 Loan Advance.

194. ING Capital reasonably relied on the representations of the SuttonPark Defendants, the Borrower (under the control of the Originator), Wander, Pasko, and Love after the March 2022 Loan Advance in forbearing from exercising its remedies or taking other action to recover the March 2022 Loan Proceeds.

195. Each of the Defendants had a duty of care to ING Capital to provide accurate representations, and each had a pecuniary interest in the March 2022 Loan Advance and in ING Capital's continued forbearance from exercising remedies or taking other action to recover the March 2022 Loan Proceeds.

196. By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against all Defendants for compensatory damages in an amount to be determined at trial.

## COUNT VIII
### (Civil Conspiracy Against All Defendants)

197. ING Capital repeats and realleges paragraphs 1 through 139 and 168 through 188 with the same force and effect as if set out in full.

198.     Defendants entered into an agreement to defraud ING Capital by, among other things, inducing ING Capital to loan more than $28 million to the Borrower by misrepresenting to ING Capital that the March 2022 Loan Proceeds would be used to acquire the Misrepresented Receivables and that ING Capital's loans to the Borrower would be secured by liens on the Misrepresented Receivables.

199.     Each of the Defendants had knowledge of the fraudulent scheme and provided assistance to the others in the furtherance of the scheme by, among other things: (i) preparing, approving, and executing documents containing the foregoing misrepresentations; (ii) directing the SuttonPark Defendants to make the foregoing misrepresentations; (iii) directing SuttonPark Servicing to transfer the proceeds of the fraud from the Borrower to SuttonPark Capital; (iv) directing SuttonPark Capital to transfer the proceeds of the fraud to the 777 Defendants and to other entities owned and controlled by the 777 Defendants; and (v) helping to conceal the fraud on an ongoing basis after the March 2022 Loan Advance..

200.     By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against the Individual Defendants and the 777 Defendants, jointly and severally, for compensatory damages in an amount to be determined at trial.

### COUNT IX
**(Unjust Enrichment Against SuttonPark Capital,
777 Partners, 600 Partners, Pasko and Wander)**

201.     ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

202.     On information and belief, upon the Borrower's receipt of the March 2022 Loan Advance, SuttonPark Capital, the 777 Defendants, Pasko and Wander caused up to $4.3 million of the March 2022 Loan proceeds to be transferred to SuttonPark Capital and then onward to one or both of the 777 Defendants.

203. In addition, SuttonPark Capital, the 777 Defendants, Pasko and Wander caused approximately $20 million of the March 2022 Loan Proceeds, as well as the proceeds of the Misdirected Receivables, to be used for the benefit of other lenders rather than ING Capital, which in turn benefited SuttonPark Capital, the 777 Defendants, Pasko and Wander.

204. Pasko and Wander are the ultimate beneficial owners of the equity in the 777 Defendants.

205. Each of SuttonPark Capital, the 777 Defendants, Pasko and Wander was enriched by the March 2022 Loan Proceeds and the proceeds of the Misdirected Receivables.

206. The March 2022 Loan Advance and the misuse of the proceeds of the Misdirected Receivables were each at ING Capital's expense.

207. It is against equity and good conscience to permit any of the Defendants to retain any of (or any of the benefit of) the March 2022 Loan Proceeds or the proceeds of the Misdirected Receivables.

208. By reason of the foregoing, ING Capital has incurred damages and is entitled to judgment against SuttonPark Capital, the 777 Defendants, Pasko and Wander, jointly and severally, for compensatory damages in an amount to be determined at trial.

## COUNT X
### (Failure to Provide Information Against SuttonPark Servicing)

209. ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

210. Section 5.02 of the Credit Agreement requires SuttonPark Servicing, among other things, to permit ING Capital "to examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer files, tapes and disks) in the possession or under the control of the Borrower, [SuttonPark Servicing or SuttonPark Capital], as the case may

be, relating to Receivables and Collateral, including, without limitation, the Receivable Files and Contracts[.]"

211. Section 4.7 of the Servicing Agreement requires SuttonPark Servicing, among other things, to "give the Borrower, the Administrative Agent and their respective counsel, accountants, and other representatives reasonable access (including, without limitation, on-site access), during normal business hours, to all of its files, books and records (including computer records) relating to the Receivables or the Receivable Files."

212. The information SuttonPark Servicing is required to make available under Section 5.02 of the Credit Agreement and Section 4.7 of the Servicing Agreement includes information identifying the intermediate and ultimate disposition of the March 2022 Loan Advance proceeds.

213. To date, despite numerous written requests, SuttonPark Servicing has not made all such information available to ING Capital, which has prevented ING Capital from completing its investigation with respect to the Misrepresented Receivables and other potential instances of fraud or wrongdoing.

214. By reason of the foregoing, ING Capital is entitled to entry of an order compelling SuttonPark Servicing to provide all information requested by ING Capital pursuant to Section 5.02 of the Credit Agreement and Section 4.7 of the Servicing Agreement.

### COUNT XI
### (Intentional Fraudulent Transfer Against SuttonPark Capital and the 777 Defendants)

215. ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

216. The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital with an actual intent to hinder, delay or defraud ING Capital.

217.    On information and belief, SuttonPark Capital then transferred these proceeds to one or both of the 777 Defendants or to other entities owned and controlled by the 777 Defendants.

218.    ING Capital is, and was at the time of the relevant transfers, a creditor of the Borrower.

219.    The Borrower's transfer of the March 2022 Loan Proceeds to SuttonPark Capital is avoidable by ING Capital.

220.    The 777 Defendants or other entities owned and controlled by the 777 Defendants were immediate or mediate transferees of the March 2022 Loan Proceeds, or were the entities for whose benefit such transfers were made.

221.    By reason of the foregoing, ING Capital is entitled to (1) avoidance of the transfer of the March 2022 Loan Proceeds by the Borrower to SuttonPark Capital, (2) an attachment of the property of SuttonPark Capital and of any immediate or mediate transferee of a value equivalent to the March 2022 Loan proceeds, and (3) judgment against SuttonPark Capital and the 777 Defendants in an amount to be determined at trial.

### COUNT XII
### (Constructive Fraudulent Transfer Against
### SuttonPark Capital and the 777 Defendants)

222.    ING Capital repeats and realleges paragraphs 1 through 139 with the same force and effect as if set out in full.

223.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital without receiving reasonably equivalent value in exchange.

224.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital at a time when the Borrower was insolvent.

225.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds to SuttonPark Capital at a time when it was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small.

226.    The Borrower (under the control of SuttonPark Capital) transferred the March 2022 Loan Proceeds at a time when it intended to or believed it would incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

227.    On information and belief, SuttonPark Capital then transferred the March 2022 Loan Proceeds to one or both of the 777 Defendants or to other entities owned and controlled by the 777 Defendants.

228.    The Borrower's transfer of the March 2022 Loan Proceeds is avoidable by ING Capital.

229.    The 777 Defendants or other entities owned and controlled by the 777 Defendants were immediate or mediate transferees of the March 2022 Loan Proceeds, or were the entities for whose benefit such transfers were made.

230.    By reason of the foregoing, ING Capital is entitled to (1) avoidance of the transfer of the March 2022 Loan Proceeds by the Borrower to SuttonPark Capital, (2) an attachment of the property of SuttonPark Capital and of any immediate or mediate transferee of a value equivalent to the March 2022 Loan proceeds, and (3) judgment against SuttonPark Capital and the 777 Defendants in the amount of the March 2022 Loan Proceeds.

## Prayer for Relief

**WHEREFORE**, ING Capital demands judgment against Defendants as follows:

(a)    Compensatory damages in an amount to be determined at trial;

(b)    Costs and expenses, including reasonable attorneys' fees;

(c)    Entry of an order compelling SuttonPark Servicing to provide all information required to be provided pursuant to Section 5.02 of the Credit Agreement and Section 4.7 of the Servicing Agreement;

(d)    Entry of an order avoiding the transfers of the March 2022 Loan Proceeds from the Borrower to SuttonPark Capital;

(e)    Attachment of the property of SuttonPark Capital of a value equivalent to the March 2022 Loan proceeds;

(f)    Judgment against SuttonPark Capital and the 777 Defendants in the amount of the March 2022 Loan Proceeds; and

(g)    Such other relief as the Court deems just and proper.

Dated: Miami, Florida
      May 9, 2025

Respectfully submitted,

*/s/ Brian Frontino*

Brian Frontino
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
(305) 515-3000
brian.frontino@morganlewis.com

- and -

Stephan E. Hornung*
Matthew C. Ziegler*
Michael Morgan*
101 Park Avenue
New York, NY 10178-0060
(212) 309-6000
stephan.hornung@morganlewis.com
matthew.ziegler@morganlewis.com
michael.morgan@morganlewis.com

*admitted *pro hac vice*

*Counsel for Plaintiff ING Capital LLC*